UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| LINDA R. PERRIN,<br><br>                              Plaintiff,<br><br>          vs.<br><br>NANCY A. BERRYHILL, ACTING<br>COMMISSIONER OF SOCIAL<br>SECURITY;<br><br>                              Defendant. | 4:16-CV-04178-LLP<br><br>REPORT AND RECOMMENDATION |

**INTRODUCTION**

Plaintiff, Linda R. Perrin, seeks judicial review of the Commissioner's

final decision denying her payment of disability insurance benefits under Title

II of the Social Security Act.[1] Ms. Perrin has filed a complaint and has

───────────────────

[1]SSI benefits are sometimes called "Title XVI" benefits, and SSD/DIB benefits are sometimes called "Title II benefits." Receipt of both forms of benefits is dependent upon whether the claimant is disabled.  The definition of disability is the same under both Titles.  The difference –greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history.  There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any.  There are corresponding and usually identical regulations for each type of benefit.  See e.g. 20 C.F.R. § 404.1520 and § 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI).  In this case, Ms. Perrin filed her application for both types of benefits.  AR 290.  Her coverage status for SSD benefits expires on December

requested the court to reverse the Commissioner's final decision denying her disability benefits and to enter an order awarding benefits. Alternatively, Ms. Perrin requests the court remand the matter to the Social Security Administration for further hearing.

This appeal of the Commissioner's final decision denying benefits is properly before the district court pursuant to 42 U.S.C. § 405(g). This matter was referred to this magistrate judge pursuant to 28 U.S.C. § 636(b) and the October 16, 2014, standing order of the Honorable Karen E. Schreier, district judge.

## STIPULATED FACTS[2]

### A.    Statement Of The Case

This action arises from plaintiff Linda R. Perrin's application for SSDI and SSI benefits filed on December 14, 2012, alleging disability since October 1, 2012, due to severe degenerative disc disease, bursitis, depression,

---

31, 2019. AR 11, 13. In other words, in order to be entitled to Title II benefits, Ms. Perrin must prove she is disabled on or before that date.

[2] The stipulated facts were agreed upon and submitted by the parties. See Docket 12. The paragraph numbers have been deleted and a few headings have been altered by the court. Some grammatical and/or stylistic changes have been made. Otherwise, the stipulated facts are recited in this opinion from the parties' submission. Citations to the appeal record will be cited by "AR" followed by the page number(s). The parties also submitted a joint statement of disputed facts. Id. p. 31. The disputed facts deemed relevant and necessary to this Report and Recommendation are incorporated into the "Discussion" section.

Meniere's disease, arthritis, bulging disc, celiac disease, and migraines. AR 103, 113, 384.

Ms. Perrin's claim was denied initially and upon reconsideration. AR 177, 182. Ms. Perrin then requested her first administrative hearing. AR 189.

Ms. Perrin received an unfavorable decision after her first administrative law judge hearing on February 20, 2014, and requested review from the Appeals Council, which remanded the claim for clarification of the residual functional capacity ("RFC") and consideration of new and material evidence. AR 149, 170, 172.

Ms. Perrin's second administrative law judge hearing was held on October 8, 2015, by the Honorable Denzel R. Busick ("ALJ"). AR 77. Ms. Perrin was represented by other counsel at her first hearing and by her current counsel at her second hearing where an unfavorable decision was issued on November 27, 2015. AR 8, 31, 56.

At Step One of the evaluation, the ALJ found that Ms. Perrin had not engaged in substantial gainful activity ("SGA") since the alleged onset date of October 1, 2012, and that she was insured for SSDI purposes through December 31, 2019. AR 13.

At Step Two, the ALJ found that Ms. Perrin had severe impairments of Meniere's disease, degenerative disc disease – lumbar spine, and obesity. AR 13.

The ALJ also found that Ms. Perrin had medically determinable impairments of obstructive sleep apnea, migraines, and other headaches, type

3

2 diabetes, and depression, all of which he determined were non-severe impairments.  AR 13-14.

The ALJ found that Ms. Perrin's depression caused mild limits in activities of daily living, social functioning, and concentration, persistence and pace, and had caused no episodes of decompensation of extended duration. AR 14.

The ALJ found that Ms. Perrin did not have an impairment that met or medically equaled one of the listed impairments in 20 CFR 404, Subpart P, App 1 (20 CFR § 404.1520(d)) (hereinafter referred to as the "Listings").  AR 14-15.

The ALJ determined that Ms. Perrin had the residual functional capacity ("RFC") to perform:

> less than a full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b), as follows:  She can lift and carry 20 pounds occasionally and 10 pounds or less frequently.  She can sit a total of 6 hours, as well as stand and walk, combined, 6 hours in an 8-hour workday.  She has no limits in reaching.  She can climb stairs slowly, with a handrail, but must avoid working on ladders, scaffolds and ropes.  She can balance frequently but crouch, kneel, stoop and crawl only occasionally.  She has no manipulation limits with the hands or fingers, no visual limits with glasses, and no communication limits.  She must avoid concentrated exposure to extreme cold, high heat, humidity, with no exposure whatsoever to hazards, such as unprotected heights, fast and dangerous machinery.

AR 15.

The ALJ's credibility finding regarding Ms. Perrin's statements concerning the intensity, persistence and limiting effects of her symptoms was that they were not "entirely credible for the reasons explained herein."  AR 15.

Based on the RFC determined by the ALJ, the ALJ found that Ms. Perrin was capable of performing her past relevant work as a mailroom supervisor and policy holder-information clerk, both as actually and generally performed, and denied the claim.  AR 19.

Ms. Perrin timely requested review by the Appeals Council (AR 7) and submitted additional new evidence that was considered by the Appeals Council consisting of:

      a.     SD Department of Social Services MAWD Information.

      b.     SD Freedom to Work MAWD FAQ.

AR 2, 4.

The Appeals Council denied Ms. Perrin's request for review making the ALJ's decision the final decision of the Commissioner.  AR 1.  Ms. Perrin then timely filed this action.

**B.    Plaintiff's Age, Education and Work Experience**

Ms. Perrin was born in 1960, making her 55 years old at the time of the denial, and she completed the 12th grade in 1979.  AR 290, 385.

The ALJ's decision identified Ms. Perrin's past relevant work as a mailroom supervisor and policy holder-information clerk, both defined in the DOT as skilled, SVP 6 occupations.  AR 19.

Ms. Perrin had earnings in 2013 from Best Buy of $11,113.93 and in 2014 from Best Buy of $2,613.81.  AR 337, 354, 365.

Ms. Perrin had earnings in 2014 from a bingo hall of $6,953.  AR 365.

Ms. Perrin had earnings in 2015 through September of $9,633.89.

AR 368.

## C.    Relevant Medical Evidence

### 1.    Midwest Ear Nose and Throat

Ms. Perrin saw Daniel Todd, M.D., on March 24, 2008, for complaints of dizziness.  AR 604.  She reported a family history of Meniere's disease.  AR 604. Ms. Perrin denied tinnitus or hearing loss. AR 604.  Ms. Perrin reported that the disability associated with the dizziness was severe, and she constantly had to make adjustment to daily activities due to the dizziness.  AR 604. Associated symptoms included nausea, falls and tremors.  AR 604.  Ms. Perrin also reported headaches.  AR 604.  Dr. Todd noted a December 17, 2007, balance test was normal.  AR 604.  An audiogram revealed normal hearing in the left ear and mild hearing loss in the right ear at 250 Hz and 8000 Hz.  AR 606.  Dr. Todd assessed Meniere's disease and dizziness and light-headedness. AR 606.  Videonystagmography ("VNG") testing was scheduled.  AR 606.

On May 2, 2008, Dr. Todd stated the VNG looked normal and showed only some slight vestibular imbalance on the left side.  AR 600, 616. Ms. Perrin stated that her balance was still an issue and had been especially bad the past week.  AR 600.  Dr. Todd indicated his overall suspicion was that allergies were a primary player.  AR 600.

### 2.    Avera McGreevy Clinic

Ms. Perrin was seen by her primary care physician, Michelle McElroy, MD, on May 17, 2012, for her Meniere's disease and back and hip pain.

6

AR 529.  Ms. Perrin reported mild back pain and bilateral hip pain rated 8, as well as bilateral knee pain.  AR 530.  She also reported falling about a month ago, and partially falling two to three times a week due to her Meniere's, which caused balance issues.  AR 530.  Ms. Perrin reported that pain made it difficult to get up out of a chair, and it was worse after she walked or stood awhile. AR 531.  Examination revealed tenderness in the sciatic area and the left trochanter area.  AR 531.  Ms. Perrin was referred to Core Orthopedics for further treatment of her hips and possible additional injections.  AR 531. Ms. Perrin weighed 243 pounds at the time of the exam, and Dr. McElroy recommended she lose twenty more pounds to help with her knee pain. AR 529, 532.

Ms. Perrin was seen on August 7, 2012, for back and hip pain and she wanted to be checked for fibromyalgia.  AR 526.  The reported history noted Meniere's, GERD, celiac disease, arthritis, headaches, and degenerative joint disease, and spondolythesis at L4-5 treated by Dr. Watts with an epidural injection in 2012.  AR 526.  The notes indicated that an MRI had been obtained by Dr. Watts and an epidural given, which helped with the pain that had been radiating into Ms. Perrin's legs, but she still had low back pain and sharp pain in her legs when working long shifts at her job at Family Dollar.  AR 527.  She reported her pain was better when working shorter 8-9 hour shifts, and worse with lifting.  AR 527.  Once the pain started it lasted for the day and she walked hunched over.  AR 527.  Dr. McElroy noted that Ms. Perrin reported crying easily, feeling down, and was looking at filing for disability because she

7

was worried she would end up in a wheelchair if she did not.  AR 527.
Dr. McElroy's assessment included chronic low back pain and depression, and
Zoloft was prescribed.  AR 527.  Dr. McElroy gave Ms. Perrin a 15 pound lifting
restriction and she was told to restrict her work shifts to 8-9 hours shifts.
AR 528.

       When Ms. Perrin was seen on December 12, 2012, for some sinus
problems the record indicated she was now working part-time at Best Buy.
AR 523.

       Ms. Perrin was seen on February 25, 2013, for migraines, problems with
her ears, and she was concerned she may be diabetic as she was thirsty all the
time. AR 544, 546.  She also reported sciatic pain with occasional radiation
down the legs, and increased issues with migraines.  She had been avoiding
medications, but then reported having flares again.  AR 546.  She said she
wanted to avoid rebound headaches.  AR 546.  She reported her balance was
off and she thought she may need a cane soon.  AR 546.  Ms. Perrin's gait was
normal.  AR 547.  Dr. McElroy approved her cane request and recommended a
four-prong cane, found her hgb a1c was slightly elevated and recommended
diet and exercise, told her to keep a headache journal to look for pattern, and
to try flexeril for headaches.  AR 548.

       Chart notes to the clinic on February 18, 2013, indicated that Ms. Perrin
no longer had health insurance (AR 553) and in March she requested that her
records be sent to Falls Community Health.  AR 549-50.

Ms. Perrin saw Dr. McElroy on December 30, 2013, and reported headaches, back pain, and trouble falling. AR 576. She reported worse bilateral back pain with radiation to her hips and headaches rated 7/10, and she had fallen in the last three months. AR 577-78. For her history of depression, it was noted Zoloft (sertraline) worked. AR 578. Ms. Perrin reported the pain was constant and sharp causing her to break out in sweats, and she could not work a five-hour shift without pain even when using tramadol and naproxen. AR 579. She was only getting 4-5 hours' sleep per night due to pain and had tried melatonin, but it did not help. AR 579. She had been at the emergency room in September due to her headaches, which caused tremors and numbness in her hands, and she was taking amitriptyline, which reduced the frequency, but she was still having headaches 3-4 times per week. AR 579. Ms. Perrin reported only taking Excedrin Migraine with the worst headaches to try to avoid rebound headaches. AR 579. She said Dr. Shafer had prescribed physical therapy, but it had not helped with her headaches. AR 579. She also reported worsening back spasms and said she was not lifting anything at work, but needed to sit after standing only 15 minutes to relieve her back pain, which made it difficult to work and to do things around the house. AR 579. She said she wanted to stay as active as possible, but could not even finish her dishes without needing to take a break. AR 579. Ms. Perrin also reported falling three times at work, but had not reported it out of fear of losing her job. AR 579. She said she typically was having 3-4 episodes per day losing her balance, and very rarely had a day with

9

no balance episodes. AR 579. Examination revealed that Ms. Perrin's mood was down, she cried easily, tenderness across her low back, positive straight leg raise test, and positive Romberg test. AR 580. Ms. Perrin's gait was normal, her strength was 5:5 in the upper and lower extremities, and her deep tendon reflexes were 2+ normal in the upper and lower extremities. AR 580. Her amitriptyline dosage was increased, and she was told to keep a headache journal to keep track of frequency. AR 581. Dr. McElroy restricted her to 5-hour maximum work shifts, discussed the importance of using her cane of proper height, and increased her dosage of tramadol. AR 581.

Ms. Perrin saw Dr. McElroy on March 5, 2014, complaining of headaches, back pain and falling. AR 689. She reported daily headaches with light sensitivity and tremors in her hands, low back pain with radiation to the buttocks making sitting and standing difficult. AR 689-90. Ms. Perrin reported falling more despite using her 4-prong cane, and numbness in her left arm/hand. AR 690. She was still working at Best Buy, but her hours had been cut. AR 690. Examination revealed tenderness over paraspinal regions in the L3-5 region, tremor in the right hand less noticeable when not being observed, and able to move short distances without her cane, but the cane was needed when walking up and down the hall with slowed gait. AR 690. Her strength was 5:5 in the upper and lower extremities. AR 690. A neurology consult was recommended, but Ms. Perrin declined due to lack of insurance, and her amitriptyline was changed to nortriptyline, and hydrocodone added for pain. AR 691.

Ms. Perrin was seen again on May 20, 2014, for follow-up on her back pain and headaches with continued similar symptoms, including low back pain radiating to her legs, numbness in her hands and arms, and daily headaches, sometimes migraines and sometimes regular headaches. AR 685. She was to continue using her cane, taking Zoloft for her depression and her nortriptyline dosage was increased for her headaches. AR 686.

Ms. Perrin was seen on July 31, 2014, and her condition and symptoms continued largely unchanged with some added fatigue, which Dr. McElroy felt may be due to her medications. AR 679. She had normal gait, normal deep tendon reflexes, and 5/5 strength in the upper and lower extremities. AR 680. Ms. Perrin had a left hand tremor more predominant when she talked about it, but otherwise unnoticeable. AR 680. Dr. McElroy also noted that she needed a neurology consult but did not have insurance. AR 680. Dr. McElroy prescribed Tramadol three times per day, Hydrocodone at bedtime along with a muscle relaxant, and heat and ice. AR 680.

Ms. Perrin was seen on September 11, 2014, complaining of intense pain rated 10/10 by her right back and right breast, and was diagnosed with a shingles outbreak and acyclovir was prescribed. AR 674-76. She continued to use her cane, but had fallen the prior Tuesday. AR 670. Ms. Perrin stated she took hydrocodone only at night. AR 670.

Dr. McElroy saw Ms. Perrin on December 18, 2014, with ongoing back pain and headaches. Ms. Perrin also reported right arm and back pain with hand tremors getting worse, and pain in her right breast. AR 670.

11

Dr. McElroy assessed her mood as down and noted she cried at times. AR 671. Dr. McElroy instructed her to continue to use her cane, again noted that she needed a neurology consult, and changed her nortriptyline to gabapentin. AR 671-72.

Ms. Perrin was seen on January 13, 2015, with ongoing symptoms of back pain, headaches, and balance problems. AR 802. She reported multiple falls despite using her cane, and had been losing her balance more at work, forcing her to sit down more. AR 803. Her medications were continued and blood pressure medication was added. Dr. McElroy was concerned that some of her headaches may be related to high blood pressure or may have some rebound aspects also. AR 804.

Ms. Perrin was seen again on March 4, 2015, and reported ongoing symptoms and also intermittent numbness in her legs and pain in her feet. AR 791. She was working part-time at a bingo hall. AR 791. Her hydrocodone and tramadol medications were continued for pain and a stress echo was planned due to chest pain. AR 792-93. The exam notes indicated that Ms. Perrin was now on South Dakota Medicaid. AR 788.

When seen on April 1, 2015, Ms. Perrin had just had her eyes examined and was told she had the beginning of macular degeneration, and needed to see a retinal specialist. AR 785.

Ms. Perrin had been diagnosed with diabetes some months earlier, and when seen on June 1, 2015, for back pain and also bilateral hand and foot pain she felt the hand and foot pain was from diabetic nerve pain. AR 770,

772.  She reported severe foot and leg pain if she stood longer than a couple of hours.  AR 772.  Ms. Perrin also reported some spells lasting 10-30 minutes where she could hear someone talking to her, but could not understand what the words were.  AR 772.  Her gait was slowed, but she was not using her cane at the exam.  AR 772.  She continued working on her blood sugars and was seeing improvement.  AR 773.  The plan included switching from gabapentin to Lyrica for her neuropathy, physical therapy for her back, and a neurology consult for her spells or possible seizures.  AR 773.

Ms. Perrin was seen on July 10, 2015, following her neurology consultation where it was felt her medication combination may be causing some inflammation.  AR 765.  Dr. McElroy noted that Ms. Perrin was depressed, stressed, and she reported she could only stand 20 minutes at work without needing to sit or lean on something to help with the back pain. AR 765.  Dr. McElroy noted that Ms. Perrin cried easily and was not sleeping well.  AR 765.  She was scheduled for a sleep study, physical therapy, and Zoloft was changed to Cymbalta for her depression with a plan for a psychological consult if there was no improvement.  AR 765-66.  The timing of her tramadol was also changed based on the recommendation from the neurologist.  AR 766.  Her gait was normal using her cane.  AR 766.  Ms. Perrin had 5:5 strength in the upper and lower extremities, and there was no tremor noted.  AR 766.

Ms. Perrin was seen on August 14, 2015, and reported that the Cymbalta was helping; she had only had one or two breakdowns, noting work was

13

stressful.  AR 758.  She continued to report back pain, and could only stand about five minutes before needing to bend to get relief from the pain, and had to bend and lean on the counter at work, which her employer did not like. AR 758.  She had been going to physical therapy and using a TENS unit, which had helped some with the back pain and her headaches.  AR 758.  Her Cymbalta dosage was increased and a TENS unit prescribed.  AR 759.  Under the section, Additional Plan Details, the exam note stated "2.  needs a note can only work 4 hours max in a day.  No more than 4 shifts in a week.  Will re-eval in 2 months."  AR 759.

Ms. Perrin was seen on August 27, 2015, complaining of abdominal pain with diarrhea and vomiting, and also reported that her headaches were coming back.  AR 752.  She was referred for a colonoscopy.  AR 752.  Under the Diet and Exercise section, the exam note stated under Duration, "60-90 minutes/day (works 4 days/week for 4 hours.  Walks all day at work, babysits grandkids other days of the week)."  AR 751.

Dr. McElroy completed a Medical Source Statement regarding Ms. Perrin's limitations if she were to attempt full-time sustained work on January 13, 2015.  AR 699.  In the form Dr. McElroy indicated she agreed that since Ms. Perrin had not been working full-time since October 1, 2012, her treatment notes documented Ms. Perrin's condition at the time of the examination not what it might have been had she been working full-time, and also agreed that if Ms. Perrin attempted sustained full-time work it would have an effect on her symptoms. AR 699.  Dr. McElroy indicated that if Ms. Perrin

14

attempted full-time sustained work she would be limited to significantly less than 6 hours sitting per workday and significantly less than 6 hours standing or walking per workday, limited to rarely lifting less than 10 pounds, and never lifting more, rarely twisting or stooping, and occasionally doing repetitive fingering, handling, or reaching with "rarely" defined as 1%-5% of an 8-hour workday, and "occasionally" as 6%-33% of an 8-hour workday.  AR 700. Dr. McElroy also stated Ms. Perrin was limited due to her medications, stating, "Has to use narcotic type pain meds cautiously due to side effects – has to time them."  AR 701.

Dr. McElroy also indicated in the January 13, 2015, Medical Source Statement that Ms. Perrin had migraines severe and frequent enough to more than minimally limit her basic work activities, and when migraines occurred or during the recovery period following the headache she would be unable to perform basic work activities for a period of hours, and her migraines are frequent enough that if she attempted full-time sustained work they would cause absences or periods of inability to work more than two days per month. Dr. McElroy also indicated that to the extent her opinions were based on subjective input from Ms. Perrin, the reported symptoms were reasonably attributed to her diagnosis of chronic migraines and reasonably consistent with available medical signs and findings, and that she believed, based on her treating relationship with Ms. Perrin and applying her professional judgment, that Ms. Perrin's reported symptoms were truthful and not exaggerated. AR 701.

15

Dr. McElroy also indicated in the January 13, 2015, Medical Source Statement that Ms. Perrin's use of a cane was medically necessary due to her medical impairments, and that if she were to attempt full-time sustained work her medical impairments would cause her to be absent in excess of two days per month, her ability to concentrate would decline through the day due to pain to the point she would be working at 75% or less of a normal rate by the last two hours of a workday, and would also routinely be off-task 10% of the time or more due to pain. AR 702.  Dr. McElroy noted that Ms. Perrin would wear down and exacerbate balance issues and her pain makes her have to change positions and she cannot stay in one place for long.  AR 702. Dr. McElroy also indicated that at times lack of insurance and financial limitations made Ms. Perrin reluctant or unable to seek or obtain care when needed.  AR 702.

On August 14, 2015, Dr. McElroy wrote a letter and stated Ms. Perrin should only work four-hour maximum shifts and only four shifts per week. AR 911.

On September 14, 2015, Dr. McElroy responded to an inquiry and indicated that the limitations she had previously identified for Ms. Perrin in the January 13, 2015, Medical Source Statement were still substantially accurate. AR 904.

On October 16, 2015, Dr. McElroy responded to an inquiry about the effect Ms. Perrin's chronic pain and depression would have on her ability to work on a sustained full-time basis.  AR 926.  Dr. McElroy indicated that

16

Ms. Perrin would be moderately limited in her ability to maintain attention and
concentration for extended periods (the approximately 2-hour segments
between arrival and first break, lunch, second break, and departure);
moderately limited in her ability to perform activities within a schedule,
maintain regular attendance and be punctual within customary tolerances; not
significantly limited in her ability to make simple work-related decisions; and,
markedly limited in her ability to complete a normal workday and workweek
without interruptions from chronic pain or depression symptoms and to
perform at a consistent pace without unreasonable number and length of rest
periods.  AR 927.  "Moderately" was defined as an impairment which more than
slightly interferes with the individual's ability to perform the designated activity
on a regular and sustained basis, *i.e.*, 8 hours a day, 5 days a week, or an
equivalent work schedule, and "Markedly" was defined as an impairment which
results in a substantial loss in the individual's ability to function
independently, appropriately, or effectively in the designated area on a regular
and sustained basis, *i.e.,* 8 hours a day, 5 days a week, or an equivalent work
schedule.

### 3.    Core Orthopedics

Ms. Perrin was seen by Dr. Watts at Core Orthopedics on June 11, 2012,
for bilateral buttock pain radiating down her legs to mid-thigh.  AR 517.  She
reported constant pain with some increased pain with standing, and she
reported an episode two months earlier of weakness with difficulty getting out
of a chair.  AR 517.  Examination revealed point tenderness along the

17

trochanteric bursa, but was otherwise normal. AR 517. Pelvis and lumbar spine x-rays were obtained that revealed a Grade 1 spondylolisthesis of L4-5 with degenerative changes at L4-5 and L5-S1, and no degenerative changes were noted of the hip. AR 517. An MRI was obtained on June 11, 2012, which revealed degenerative Grade 1 spondylolisthesis of L4-5 secondary to facet arthropathy with minimal broad-based annular protrusion and no nerve root impingement, mild central spinal stenosis, mild annular disc protrusions at T11-12 and T12-L1 with no impression upon the thoracic spinal cord, and changes of mild multilevel degenerative spondylosis and facet arthropathy. AR 516.

Ms. Perrin was seen again on June 13, 2012, to review the MRI results and an epidural steroid injection to L4-5 was planned, and later administered at Avera McKennan hospital on June 18, 2012. AR 513, 637. Dr. Watts also restricted her to no lifting greater than 10 pounds and no working longer than 8-hour workdays for the next month until her condition hopefully calmed down due to the epidural and her back disc herniation. AR 513-14.

### 4.    Falls Community Health

Ms. Perrin was seen as a new patient at Falls Community Health on March 14, 2013, for rectal bleeding and to review her multiple medical problems. AR 557. She needed to get cheaper medications and had recently lost her insurance. AR 557. Her assessments included depression and her sertraline was refilled. AR 559.

18

Ms. Perrin was seen again on April 18, 2013, after her records had been transferred to Falls Community Health.  AR 556.  She reported that her Meniere's had been worse lately, and that she had been "hitting the wall most every day at work."  AR 556.  Charles Shafer, M.D., recommended she get a cane at a pharmacy or a second hand store.  AR 557. Tramadol was prescribed for pain, and her records from Core Orthopedics were requested.  AR 557.

Ms. Perrin was seen on June 20, 2013, to discuss her sciatica, restless leg syndrome, falling problems, and migraines.  AR 567.  Ms. Perrin also inquired about a handicap sticker for days when having trouble walking. AR 567.  She reported that she felt the tramadol was helping her get a little more sleep, her daughter thought she had been moody, so she had stopped taking sertraline, she was having more migraines lately, almost daily, and had been taking at least four Excedrin Migraine daily.  AR 567.  She also reported that her back pain had been more of an issue lately.  AR 567.  Ms. Perrin's exam findings were largely normal.  AR 568.  Her straight leg raising test was negative. AR 568.  Her tramadol dosage was increased to help with her sciatica. AR 568.  Dr. Shafer also directed her to continue using a cane for balance, and completed a handicap parking form for intermittent use.  AR 569.

Ms. Perrin was seen on September 17, 2013, for follow up on her migraines.  AR 565.  She had recently been to the emergency room with right hand tremors, which had not returned since that time. AR 565.  Dr. Shafer prescribed amitriptyline and physical therapy, which he hoped would help with

19

her MSK (musculoskeletal) contribution to her headaches, which he suspected were mainly "tension" type.  AR 567.

Ms. Perrin was seen on November 18, 2013, for physical therapy and she reported no upper back pain and no neck pain with any motion exam.  AR 565. She reported having headaches 2-3 times per week and felt they were migraines and sometimes caused by her sinuses, but did not think her neck caused her headaches.  AR 565.  The physical therapist's diagnosis was migraine type headaches and that they did not seem cervicogenic in nature, she had no dysfunction or pain in the neck, and he also noted chronic low back pain from degenerative disc disease.  AR 565.  No physical therapy treatment was planned.  AR 565.

### 5.    Neurology Associates

Ms. Perrin was seen at Neurology Associates on June 23, 2015, for spells when she would find someone talking to her, but she was unable to understand what the words were.  AR 733.  She reported that she felt lightheaded and had nausea during the spells, which lasted 10-30 minutes. AR 733.  She also reported issues with falls, use of a cane for the last year, and chronic migraines with tremulous following a severe migraine a year earlier. AR 733.  Her exam was largely normal except her gait and balance, which had a positive Romberg, and she could not stand unassisted, she ambulated with a cane, her gait was wide-based, and her sensory was mildly diminished to vibratory sensation in the feet bilaterally.  AR 735.  Dr. Boyle's assessment was that the spells could be partial seizures, TIA, or migrainous phenomenon; she

20

also had a gait disturbance likely caused by Meniere's, and diabetic peripheral neuropathy.  AR 736.  An electromyography ("EMG") showed the beta activity found in the EEG was likely a medication effect, the episodes of theta activity was most likely due to alpha hypersynchrony, and there was no evidence for an underlying seizure disorder or focal central nervous system lesion.  AR 738.  An MRI of the brain was negative.  AR 740.  A chest x-ray revealed no cardiopulmonary process.  AR 742.

### 6.    Avera McKennan Hospital

The earliest hospital record in the appeal record from July 17, 2008, a perfusion scan, indicated that Dr. McElroy was Ms. Perrin's treating physician at that time. AR 663.

Ms. Perrin received physical therapy treatment due to right SI joint/hip pain beginning June 4, 2010, and ending with four sessions on June 14, 2010, with goals met and 95% improvement.  AR 645, 647.

Ms. Perrin was given an epidural injection ordered by Dr. Watts on June 18, 2012.  AR 637.  During that procedure she reported that she also noticed some increased pain with prolonged sitting, and said that the onset was ongoing, but symptoms had increased recently.  AR 636.

Ms. Perrin was seen at the Emergency Room on September 14, 2013, complaining of tremors in her right hand.  AR 627.  She reported the tremors had started that day and she had been having headaches the last two weeks lasting longer than her migraines typically did.  AR 627.  She was observed to be somewhat teary and anxious.  AR 627.  Examination revealed her right

21

hand had "almost like a pill rolling tremor" and with finger-nose it continued.
AR 628.  The emergency room doctor noted that when she was engaged it
seemed like the tremor was less and then with attention it might be a little
more, but the doctor was unsure what that meant.  AR 628.  Ms. Perrin was
given something for her headache and a head CT was performed after waiting
quite a while that revealed hyperostosis frontalis interna, but was otherwise
normal.  AR 628.  The tremor resolved and the doctor felt it may have been an
atypical migraine or an incidental tremor, but he did not think it was a partial
seizure.  AR 628.

Ms. Perrin received physical therapy due to back pain beginning June 9,
2015, and was using a quad cane at the time due to balance issues.  AR 853.
She was working at the bingo hall and reported limitations with prolonged
standing, sitting or walking and difficulty sleeping.  AR 853.  The Oswestry
back questionnaire scored 64%, placing her in the severe disability category.
AR 854.  She was using her quad cane to ambulate and was observed to have
significant decreased balance with tendency to lose balance towards side of
leaning and was unable to stand on one leg for more than one second.  AR 854.
Ms. Perrin had a positive slump test bilaterally.  AR 854.

Ms. Perrin was seen on June 26, 2015, at the hospital for a brain MRI
due to spells, gait disturbance and falls, ordered by Dr. Boyle of Neurology
Associates.  AR 856-58.  The MRI was negative.  AR 860.

Ms. Perrin was referred to the Avera Dizziness and Balance Clinic for
physical therapy and treatment of imbalance and falls by neurologist,

22

Dr. Boyle, beginning on July 8, 2015. AR 876. She stated she had a long history of increasing balance issues and falls. AR 876. She stated she was working at Burnside Game Place. AR 878. The balance exam revealed mild sway with eyes open, significant sway in all directions with eyes closed and feet apart, and loss of balance with eyes closed and feet together. AR 878. The compliant surface test with eyes open showed mild sway, and with eyes closed loss of balance in less than 4 seconds, and the single leg stance revealed significant sway with either foot held one second. AR 879. Her composite postural stability score was significantly below expected norm. AR 879. The assessment found difficulty in all testing utilizing vestibular and somatosensory input for balance when visual system was altered by either movement in her visual field, eyes being closed, or low light situations. AR 880. Ms. Perrin's dizziness handicap inventory was 38% impairment and her dynamic gait index was 46% impairment and her rehab potential was fair to good with limiting factors possibly being her long-term balance issues. AR 881.

Ms. Perrin was discharged from the Dizziness Clinic on August 17, 2015, after four therapy sessions. AR 888. Her balance tests had all improved and she was ambulating without an assistive device with no evidence for gait abnormality. AR 889. Her composite stability score had improved to a normal range and her dynamic gait index had improved from a significant fall risk to 4% impairment. AR 889. The notes indicated that Ms. Perrin reported she was

no longer having dizziness or imbalance related to her vestibular dysfunction. AR 889.

### 7.    Avera Behavioral Health

Ms. Perrin attended counseling on September 15, 2015, and September 29, 2015, and reported issues coping with her medical conditions and that her chronic back pain limited her employment opportunities.  AR 914.  She reported struggling with her view of herself and being depressed regarding her inability to contribute after being limited by her disabilities.  AR 913-14. Cognitive behavioral therapy was recommended.  AR 914.  She reported pain due to her back and headaches, rated 6/10.  AR 917.

### 8.    Pulmonary & Sleep Consultants

Ms. Perrin was tested and diagnosed with moderate obstructive sleep apnea on June 17, 2008, and a CPAP was recommended.  AR 586.

Ms. Perrin was tested and diagnosed with mild obstructive sleep apnea on June 30, 2015, and a CPAP was recommended.  AR 723.

### 9.    South Dakota MAWD Program Records

Ms. Perrin applied for and was found eligible for the South Dakota Medical Assistance for Workers with Disabilities Program ("MAWD") effective July 1, 2014.  AR 704.  The notice also stated she was approved for Medicaid effective July 1, 2014.  AR 704.  The MAWD determination notice stated that the MAWD disability determination team reviewed the medical evidence and work/social history concerning Ms. Perrin and found that she could not perform her past relevant work and a decision of disabled was directed per

24

"Vocational Rule 200.00." AR 705. The determination was signed by medical consultant, Dr. Erickson, on January 28, 2015, and lists an "onset" of July 1, 2014, with a next review date of March 1, 2022. AR 705.

Ms. Perrin completed a Medical Information and Function Report as part of her MAWD application in which she listed impairments and symptoms. AR 706-22. She listed her treatment provider as Dr. McElroy. AR 708.

### 10. State Agency Assessments

The state agency medical consultant evaluated the file at the initial level on March 1, 2013, and found that Ms. Perrin had a severe physical impairment of disorders of the back – discogenic and degenerative. AR 107, 117. The consultant found that Ms. Perrin could lift 20 pounds occasionally and 10 pounds frequently, and stand, walk or sit six hours of an 8-hour workday. AR 109, 119. The consultant stated in the explanation, "Limitations due to probable fibromyalgia and chronic back pain related to DDD/DJD. . . ." AR 110, 120. The consultant also found Ms. Perrin limited to only occasional climbing ramps/stairs, ladders/ropes/scaffolds, stooping, kneeling, crouching, and crawling. AR 110, 120. The consultant also found that Ms. Perrin's balance was unlimited. AR 110, 120. The consultant also stated that "Depression is a problem which may be contributing to her symptoms." AR 110, 120.

The state agency medical consultant evaluated the file at the reconsideration level on May 24, 2013, and also found that Ms. Perrin had a severe physical impairment of disorders of the back – discogenic and

25

degenerative and also found severe vestibular system disorders, and non-severe medically determinable impairments of other disorders of the gastrointestinal system and migraines. AR 129, 142. The consultant at the reconsideration level found the same exertional limitations as the state agency medical consultant did at the initial level. AR 132, 144-45. Again, the physical expert stated in the explanation, "Limitations due to probable fibromyalgia and chronic back pain related to DDD/DJD . . ." AR 132, 145. The consultant at the reconsideration level also found the same postural limitations, except he stated Ms. Perrin should never climb ladders/ropes/scaffolds, and found that her balance was unlimited. AR 132, 145. The consultant at the reconsideration level stated in the explanation section for postural limitations "Has balance issues with climbing due to Meniere's" and stated in the explanation section for environmental limitations that she "Has balance issues due to Meniere's." AR 132-33, 145-46. The consultant also stated that Ms. Perrin had pain from both spine and from migraines, and again noted "Depression is a problem which may be contributing to her symptoms." AR 146. The consultant at the reconsideration level stated he gave great weight to the opinion of the treating physician, Dr. McElroy, dated February 25, 2013, because it was from the treating physician and was consistent with other evidence in the file. AR 131, 144.

The state agency psychological consultant at the initial level on February 23, 2013, found that Ms. Perrin had non-severe affective disorder. AR 107. This consultant found that Ms. Perrin had mild difficulties in maintaining

26

social functioning and maintaining concentration, persistence, or pace.
AR 108. The state agency psychological consultant at the reconsideration level
made the same findings. AR 130.

**D.    Testimony at ALJ Hearings**

**1.    Ms. Perrin's Testimony at the 1st ALJ Hearing on
February 4, 2014**

Ms. Perrin testified she was born on November 12, 1960, and was 53
years old at the time of the hearing, completed high school, but no college.
AR 33-34. She testified she was living with her daughter because she could
not make it on her own; she was sick at work all the time and unable to work
some of the time because of her illnesses. AR 33. She said the only household
tasks she was able to do was keep up her room and the bathroom, which she
needed to divide into three days. AR 34.

Ms. Perrin was using a cane at the hearing and testified that Dr. McElroy
had told her to get one due to falling from her Meniere's. AR 34. She said she
falls at least three times per week when she was without her cane, and she still
almost fell at the hearing, but the cane helped her prevent falling, and she had
been using it about two to three weeks. AR 35, 44.

Ms. Perrin said that of her impairments the Meniere's and her back
problems were the worst and Dr. McElroy had been her doctor for a long time.
AR 35. She said she did go to the free clinic in Sioux Falls for a while when she
lost her insurance, but she went back to Dr. McElroy because Dr. Schaeffer did
not fully understand her health issues. AR 35-36.

Ms. Perrin testified that she was working part-time at Best Buy in the customer service area. AR 36. She said she was working 3-4 hour shifts, and then a 5-hour shift on the weekend. AR 37. Ms. Perrin testified that her employer allowed her to go sit down in the back room whenever she needed to due to her pain. AR 36-37. She said that in her four-hour shift she would need to go sit in the back room at least three times. AR 37.

Ms. Perrin testified that Best Buy also did not put her on written warnings for absences like they would for the other employees, and she was calling in sick every two to three weeks for one to four days at a time due to back pain or migraines. AR 37-38.

Ms. Perrin testified that prior to working at Best Buy she worked at Family Dollar Store as an assistant manager, but also had to stock shelves and unload trucks, and needed to be able to lift up to 50 pounds, but Dr. McElroy had restricted her to 10 pounds. AR 38-39. She said she was also calling in sick or switching shifts at that job. AR 39-40. She said her hours were first cut because she could not do the physical work, then she was demoted to cashier, and then she was fired because they said her till was short $80, but she felt they were trying to get rid of her because she could not lift the stuff she needed to. AR 40.

Ms. Perrin testified her job at Esurance was customer service work over the phone dealing with customers who wanted to make payments or cancel their insurance plan. AR 41. She said she only worked there about 15 months roughly and was fired because she was missing at least two days per month,

28

due to back pain, headaches, and stomach problems before she found out she had Celiacs.  AR 41.

She said she also worked at a bingo hall, but it allowed smoking, which made her illnesses worse and caused her to miss work.  AR 42.  Ms. Perrin testified she worked at Premiere Bankcard in the credit department.  AR 42.

Ms. Perrin testified she still had a 10 pound lifting restriction from Dr. McElroy, which had started about three years earlier.  AR 45.  When asked about standing she said at work she is leaning over on the counter for support after 15 minutes.  AR 45.  She said after sitting 15-20 minutes she needed to get up and walk around due to back and hip pain.  AR 46.  She said she was 5 feet 5 inches tall and weighed 252 pounds, which she was told was too heavy to be able to have back surgery.  AR 46.  She said Dr. McElroy was also treating her for depression for which she was taking sertraline.  AR 47.

## 2. Vocational Expert Testimony at the 1st Hearing

The vocational expert ("VE") testified that any absences beyond one vacation day and one sick day per month would be outside the norm and an individual would be unable to maintain employment with greater absences. AR 51.  The VE also testified that the types of breaks Ms. Perrin described she was taking at Best Buy would not generally be tolerated by employers.  AR 52.

## 3. Ms. Perrin's Testimony at the 2nd ALJ Hearing on October 8, 2015

Ms. Perrin testified similar to the first hearing regarding living with her daughter due to financial reasons.  AR 63.

29

Ms. Perrin brought her four-prong cane to the hearing and said she'd had it for a year and a half or more, and both Dr. McElroy and Dr. Schaeffer had told her to get a four-prong cane in February to April 2013. AR 63. She said she got the cane because she gets lightheaded and unbalanced and goes toward the wall or falls due to her Meniere's. AR 64.

Ms. Perrin testified that the current year she had been approved for MAWD and received Medicaid under that program. AR 65.

When asked about writing problems, Ms. Perrin testified that the only issue was the sitting part, and explained that when completing a questionnaire she could only do two or three questions before needing to get up and move around due to back pain. AR 66.

Ms. Perrin testified that Dr. Shafer had authorized a handicap parking permit for her, but Dr. McElroy was her primary doctor, and she only saw Dr. Shafer when she lost her insurance. AR 66-67.

Ms. Perrin testified that her work at the Family Dollar Store was her last full-time work, and she had difficulty with the long weekend shifts, but when she cut back to normal 8-hours shifts she still could not do it and would have to start sitting down halfway through her shift due to pain. AR 68.

Ms. Perrin testified that when working part-time at Best Buy she received accommodations including being allowed to sit on a stool while cashiering, and being allowed to go sit on a chair in the back room once in a while. AR 69. She said she also received help if there was anything over 20 pounds that needed lifting off the counter. AR 69-70. She said she missed at least two

shifts per month at Best Buy, and after the Christmas season in 2013 they cut her hours to ten hours per week because other workers were willing to work more than four-hour shifts so she switched jobs.  AR 70.

Ms. Perrin testified she then worked part-time at a bingo hall as a floor walker and a part-time caller, which were good options for her because the floor walker job let her move around and sit a little bit, and the caller job let her sit on a cushioned chair and stand when needed.  AR 70-72.  She worked about a four-hour shift and would do both of those jobs at each shift.  AR 72.  She still had to carry muscle relaxers with her and it was hard making it through the four-hour shifts.  AR 72.  She had tried longer shifts but could not do it and was unable to work for as long as two days after trying.  AR 73.  She testified that she leaves work early a couple of times per month due to pain.  AR 73-74.

Ms. Perrin testified that she worked at Esurance and answered incoming customer calls for address changes, policy cancellations, or minor policy questions, but no detail because she was not trained for that.  AR 74.  She would not be able to do that job because it required you to sit in one place in front of your computer the entire time.  AR 74.  Her chronic pain makes her more irritable and combative and she felt she would end up being rude to customers if she tried to do a job like that.  AR 75.

Ms. Perrin testified she worked at Premier Bankcard and her main job was in the correspondence unit where she processed incoming mail she received in post office bins.  AR 75-76.  She also supervised the work other

employees were doing with the mail.  AR 76.  She would not be able to do the lifting required in that job or the supervising because she becomes irritated at little things, and she would not be able to sit that much. AR 77.

Ms. Perrin testified that her back pain was like a dull ache that could go into agonizing spasms, and at times it turns into "knife stabbing" pain.  AR 78. When she is in a lot of pain she cannot even wash the dishes.  AR 78. Standing, lifting, and sitting for more than a few minutes caused pain and she needed to switch positions and move around.  AR 78-79.  She tried sleeping in the fetal position, the best position is lying down curled up a little bit, and she spends about half her time lying down in bed.  AR 80.  When her pain was worse she had problems remembering to do things, and at work later in her shifts she would sit and after a while have to wonder what she was doing. AR 80-81.  She was taking Tramadol, Naproxen, Lyrica, and hydrocodone for pain.  AR 84.

Ms. Perrin testified that her inner ear affects her balance and she always takes her cane with her when she leaves the house.  AR 81.  The "spells" she had was a different issue than her balance problems, and she felt they had decided that stress triggered the spells. AR 81.

Ms. Perrin testified that she had several types of headaches, including migraines, allergy headaches, and regular headaches from pain.  AR 82.  Her migraines made her light sensitive and she went to a dark room, was unable to work, and she had them about three times per month.  AR 83.

Ms. Perrin testified her June, 2012, epidural had helped for three or four months to where she still had pain, but it was not excruciating pain.  AR 83.

Ms. Perrin testified she used icepacks and Biofreeze gel.  AR 85.

Ms. Perrin testified that Dr. McElroy treated her for depression and she had tried at least five different medications, and was currently taking generic Cymbalta, which helped with some of her symptoms, but she was still lacking in patience, and was short with people.  AR 86.  She had been sent to counseling, and felt that her chronic pain affected her depression, and she could not concentrate on anything that might be productive or helpful to people.  AR 86-87.  She felt that when her pain was worse, her depression was worse because she could not handle people's comments at all.  AR 87.

### 4.    Vocational Expert Testimony at the 2nd Hearing

The VE testified that he would remove the correspondence clerk job from the past work exhibit and add the job of mailroom supervisor, DOT #209.137-010.  AR 88.

The ALJ's first hypothetical to the VE was a question consistent with ultimate RFC determined by the ALJ, and the VE testified that individual would be able to perform Ms. Perrin's past work of mailroom supervisor, and policy holder – information clerk.  AR 91.

The VE testified that an individual who missed work ½ - 1 day per week would not be able to maintain any work.  AR 94.  The VE also testified that an individual who, due to chronic pain, slowed and was performing at only 75% of normal pace the last two hours of the workday, or an individual who, due to

33

chronic pain, was off task 10% of the time, would not be able to maintain competitive employment. AR 99.

The VE testified that he was familiar with the general education development ("GED") portion of the DOT description of each job, and agreed that jobs with higher levels of reasoning defined in that section would require individuals with higher levels of aptitude in those areas. AR 100. The VE testified that an individual with moderate impacts to concentration due to chronic pain would be unable to perform jobs with a GED reasoning level of 4, because they would require a high level of sustained concentration, and moderate limitations in concentration were more associated with simple, routine, or unskilled work. AR 100-01.

### 5. Other Evidence

Ms. Perrin completed a Work Activity report in which she identified impairment related work expenses of $100 per month for medications for January, 2012 – October 20, 2012, and $240 per month for medications for November, 2012, to present. AR 374. The form was completed on January 22, 2013. AR 375.

On January 24, 2013, Ms. Perrin completed a Function Report on which she stated her daily activities included eating breakfast, babysitting for her daughter during the day, working evenings and weekends, cleaning, washing dishes, watching television, and going to bed. AR 400. She stated she babysat so her daughter could work. AR 401. Ms. Perrin indicated no one helped her babysit. AR 401. She stated she could care for her personal needs without

problem and needed no reminders.  AR 401-02.  Ms. Perrin reported she could

prepare normal meals, but needed to avoid foods to which she was allergic.

AR 402.  She stated preparing meals could take from ten minutes to one hour.

AR 402.  Ms. Perrin reported she could clean, wash clothes, and wash dishes.

AR 402.  She indicated she went outside daily and traveled by walking, driving

a car, riding in a car, and using public transportation.  AR 403.  Ms. Perrin

stated she could shop in stores for food and clothes, but the trips were short.

AR 403.  She indicated she could pay bills, handle a savings account, count

change, and use a checkbook/money order.  AR 404.  For hobbies, Ms. Perrin

stated she read, watched television, made crafts and played cards.  AR 404.

She reported her social activities included lunch every couple of months,

church when she did not work, and a movie a few times a year.  AR 404.

Ms. Perrin stated she had problems getting along with people sometimes

because she did not get enough sleep, was in pain and cranky, and often got

migraine headaches.  AR 405.  She stated she could lift up to 15 pounds, stand

for thirty minutes, walk for thirty minutes or less, and sit for an hour or less.

AR 405.  Ms. Perrin reported she could pay attention five to ten minutes, finish

what she started although sidetracked easily, follow written instructions well,

and follow spoken instructions fairly well if she remembered them.  AR 405.

She stated she got along well with authority figures and had never been fired or

laid off from a job because of problems getting along with other people.

AR 406.  Ms. Perrin reported she handled stress poorly, but handled changes

in routine ok most of the time.  AR 406.  She stated a cane had not been

prescribed yet, but she would be needing one soon and it would be prescribed when she could afford it. AR 406. She stated she would use the cane everyday once she could afford it. AR 406. She said when the cane is prescribed it will be a four prong cane. AR 407.

Ms. Perrin also stated in the January 24, 2013, Function Report that she was in pain constantly and could only sleep about three to four hours at a time. AR 401. She stated when in pain constantly she used the microwave a lot so meal prep time could vary from 10 minutes to an hour if she cooked in the oven. AR 402. Ms. Perrin stated she did the dishes almost every day, but could only stand for 15 minutes. AR 402. She stated she needed help with the chores when she was not able to stand long because of Meniere's and too much pain. AR 402. Ms. Perrin stated she could shop in stores, but only short trips and just once a week for no longer than one half an hour at a time. AR 403. She stated that what she could do for hobbies was constantly changing and she could only stand, sit, walk, or lie down for short periods of time. AR 404. She could handle changes in routine okay most of the time, but other times it put her in a panic mode and stressed her more. AR 406. She was starting to fall more and would need a cane soon, and her arthritis and bursitis caused constant pain along with constant hip and back pain. AR 407.

On May 2, 2013, Ms. Perrin completed another Function Report in which she denied caring for anyone else and reported difficulties with personal care. AR 425. She stated she prepared her own meals, but in response to the question how often she replied "don't anymore." AR 426. She did laundry and

36

light cleaning only.  AR 426.  She reported she went outside only three to four days a week for work only and a few groceries, and for transportation could drive a car and ride in a car.  AR 427.  Ms. Perrin stated she could shop in stores for groceries in just quick trips of ten minutes.  AR 427.  For hobbies she read, did crafts, watched television, and watched movies, but not too often.  AR 428.

Ms. Perrin also stated in the May 2, 2013, Function Report in the section about meal preparation that she prepared things that are easy to make and go in the oven or microwave, but then stated she does not prepare food or meals anymore.  AR 426.  She stated she cannot stand long enough to do cooking on the stove due to pain.  AR 426.  She listed laundry and light cleaning as household chores she was able to do, but stated she needed help or encouragement doing them sometimes when she was hurting too much and did not want to move.  AR 426.  Ms. Perrin stated she could only lift up to 10 pounds, and she needed a cane that was prescribed by two doctors in the last six months.  AR 429, 430.

Ms. Perrin completed a Work Activity report in which she identified accommodations she received at her job at Best Buy including reduced hours, assistance with lifting more than 10 pounds, and taking breaks to rest due to pain.  AR 452.  She also stated that her hours were being reduced, she had been calling in sick more, she was needing to sit down at work more due to back pain, and she was losing her balance more at work.  AR 453.

Ms. Perrin submitted a letter from a co-worker, Andrea Rice, dated March 2014.  Ms. Rice stated she had worked with Ms. Perrin for a long time and had observed Ms. Perrin in pain to the point where Ms. Perrin could not stand.  Ms. Rice told her to go and sit down, and Ms. Perrin took breaks to feel better at work.  Ms. Rice also noted that Ms. Perrin's balance was not good. AR 477.

Ms. Perrin submitted a letter from a co-worker, John McLemore, dated March 2014.  Mr. McLemore stated that he worked with Ms. Perrin at Best Buy and in the last few months he noted her losing her balance more often, needing to sit down more often, and missing more shifts.  AR 475.

Ms. Perrin submitted a letter from a co-worker, Fabian Ramos-Loza, dated March 2014.  Mr. Ramos-Loza stated that he worked with Ms. Perrin since the prior March and over the course of the year he observed her taking more breaks than usual due to her pain and he had observed her losing her balance multiple times.  AR 476.

Ms. Perrin submitted a brochure from the South Dakota Department of Social Services about the Medical Assistance for Workers with Disabilities ("MAWD").  The brochure stated to be eligible for the program, among other things, the individual must "Meet the Social Security definition of being disabled, except for the criteria related to employment."  AR 504, 506.

Ms. Perrin submitted an excerpt from the MAWD Frequently Asked Questions list which stated to be eligible a person must be working competitively "and have a disability as determined by Disability Determination

38

Services" which is the same South Dakota state agency that performs disability determinations at the initial and reconsideration levels for Social Security. AR 512.

## DISCUSSION

### A.    Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); <u>Minor v. Astrue</u>, 574 F.3d 625, 627 (8th Cir. 2009).  Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Klug v. Weinberger</u>, 514 F.2d 423, 425 (8th Cir. 1975).  "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action." <u>Scott ex rel. Scott v. Astrue</u>, 529 F.3d 818, 821 (8th Cir. 2008) (internal punctuation altered, citations omitted).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. <u>Minor</u>, 574 F.3d at 627.   The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision.  <u>Woolf v. Shalala</u> 3 F.3d 1210, 1213  (8th Cir. 1993); <u>Reed v. Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005).  If it is possible to draw two

39

inconsistent positions from the evidence and one of those positions represents
the Commissioner's findings, the Commissioner must be affirmed.  Oberst v.
Shalala, 2 F.3d 249, 250 (8th Cir. 1993).  "In short, a reviewing court should
neither consider a claim de novo, nor abdicate its function to carefully analyze
the entire record."  Mittlestedt v. Apfel, 204 F.3d 847, 851
(8th Cir. 2000)(citations omitted).

　　　The court must also review the decision by the ALJ to determine if an
error of law has been committed.  Smith v. Sullivan, 982 F.2d 308, 311
(8th Cir. 1992); 42 U.S.C. § 405(g).  Specifically, a court must evaluate whether
the ALJ applied an erroneous legal standard in the disability analysis.
Erroneous interpretations of law will be reversed.  Walker v. Apfel, 141 F.3d
852, 853 (8th Cir. 1998)(citations omitted).   The Commissioner's conclusions
of law are only persuasive, not binding, on the reviewing court.  Smith, 982
F.2d at 311.

**B.    The Disability Determination and the Five-Step Procedure**

　　　Social Security law defines disability as the inability to do any
substantial gainful activity by reason of any medically determinable physical or
mental impairment which can be expected to result in death or which has
lasted or can be expected to last for a continuous period of not less than twelve
months.  42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment
must be severe, making the claimant unable to do his previous work, or any
other substantial gainful activity which exists in the national economy.
42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

40

The ALJ applies a five-step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB applications. <u>Smith v. Shalala</u>, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520. When a determination that an applicant is or is not disabled can be made at any step, evaluation under a subsequent step is unnecessary. <u>Bartlett v. Heckler</u>, 777 F.2d 1318, 1319 (8th Cir. 1985). The five steps are as follows:

**Step One:**    Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

**Step Two:** Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. <u>Browning v. Sullivan</u>, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three:** Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. <u>Bartlett</u> 777 F.2d at 1320, n.2. This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. <u>Heckler v. Campbell</u>, 461 U.S. 458, 460, (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

**Step Four:** Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 1520(f).

## C.    **Burden of Proof**

The plaintiff bears the burden of proof at steps one through four of the five-step inquiry. Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a). The burden of proof shifts to the Commissioner at step five. "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting is "a long standing judicial gloss on the Social Security Act." Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." Stormo v. Barnhart 377 F.3d 801, 806 (8th Cir. 2004).

**D.    The Parties' Positions**

Ms. Perrin asserts the Commissioner erred by finding her not disabled within the meaning of the Social Security Act.  She asserts the Commissioner erred in two ways: (1) the Commissioner failed to properly identify her severe mental impairments; (2) the Commissioner's determination of her residual functional capacity (RFC) was not supported by substantial evidence.[3]  The Commissioner asserts substantial evidence supports the ALJ's determination that Ms. Perrin was not disabled during the relevant time frame and the decision should be affirmed.

**E.    Analysis**

Ms. Perrin's arguments are addressed in turn below:

**1.    Whether the Commissioner Failed to Properly Identify All of Ms. Perrin's Severe Impairments?**

Ms. Perrin asserts the Commissioner erred by failing to identify her chronic headaches as a severe impairment at step two of the five-step analysis. The ALJ identified Ms. Perrin's headaches as a medically determinable impairment, but determined they were not severe.  AR 14.  In support of this conclusion, the ALJ indicated Ms. Perrin's treatment for headaches had been limited, that she had avoided taking her headache medication, and that there was no evidence in the record that she had followed doctor's advice to keep a headache journal.  AR 14 (citing AR 546, 581).

_____

[3] This assignment of error has four sub-parts.

The Commissioner counters that this court need not even address Ms. Perrin's argument regarding the ALJ's failure to identify her chronic headaches as a severe impairment, because the real issue in this case is whether substantial evidence supports the ALJ's formulation of Ms. Perrin's RFC.  See Commissioner's brief, Docket 15, p. 7.  After a claimant clears the step two preliminary hurdle, the Commissioner argues, the classification of an impairment as severe or non-severe carries no legal significance.  Id. at p. 8 (citing 20 C.F.R. § 404.1545(e)).[4]   In other words, the Commissioner asserts that because the ALJ acknowledged Ms. Perrin's headaches as a non-severe medically determinable impairment, he was required under 20 C.F.R. § 404.1545(e) to consider the limiting effects of the headaches when determining Ms. Perrin's RFC.  Whether the headaches were deemed by the

_____

[4] 20 C.F.R. § 404.1545(e) states:

(e) Total limiting effects.  When you have a severe impairment(s), but your symptoms, signs, and laboratory findings do not meet or equal those of a listed impairment in appendix 1 of this subpart, we will consider the limiting effects of all your impairment(s), even those that are not severe, in determining your residual functional capacity.  Pain or other symptoms may cause a limitation of function beyond that which can be determined on the basis of the anatomical, physiological, or psychological abnormalities considered alone, e.g., someone with a low back disorder may be fully capable of the physical demands consistent with those of sustained medium work activity, but another person with the same disorder, because of pain, may not be capable of more than the physical demands consistent with light work activity on a sustained basis.  In assessing the total limiting effects of your impairment(s) and any related symptoms, we will consider all of the medical and nonmedical evidence, including the information described in § 404.1529(c).

44

ALJ to be severe or non-severe, the Commissioner argues, does not really matter past the two step level of the analysis.

"It is the claimant's burden to establish that his impairment or combination of impairments are severe." <u>Kirby v. Astrue</u>, 500 F.3d 705, 707 (8th Cir. 2007). A severe impairment is defined as one which significantly limits a physical or mental ability to do basic work activities. 20 C.F.R. § 1521. An impairment is not severe, however, if it "amounts to only a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." <u>Kirby</u>, 500 F.3d at 707. "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two." <u>Id</u>. (citation omitted). The claimant bears the burden of showing a severe impairment significantly limits a physical or mental ability to do basic work activities, "but the burden of a claimant at this stage is not great." <u>Caviness v. Massanari</u>, 250 F.3d 603, 605 (8th Cir. 2001). Additionally, the impairment must have lasted at least twelve months or be expected to result in death. <u>See</u> 20 C.F.R. § 404.1509.

In brief, the Commissioner cites four out-of-circuit cases for the proposition that the failure to identify a severe impairment at step two is harmless so long as benefits are not denied at step two: <u>Carpenter v. Astrue</u>, 537 F.3d 1264, 1266 (10th Cir. 2008); <u>Lewis v. Astrue</u>, 498 F.3d 909, 911 (9th Cir. 2007); <u>Maziarz v. Secretary of Health & Human Svcs</u>. 837 F.2d 240, 244 (6th Cir. 1987); <u>Rutherford v. Barnhart</u> (399 F.3d 546, 553 (3d Cir. 2005).

In <u>Carpenter</u>, the court reversed and remanded because the ALJ failed to adequately consider all of the claimant's impairments in combination when determining whether she was disabled at the remaining steps of the disability process. <u>Carpenter</u>, 537 F.3d at 1266-67.  And in <u>Lewis</u>, the court specifically stated that any error at step two of the analysis was harmless because the restrictions imposed by the claimant's bursitis (the impairment he alleged was erroneously omitted at step two) was were discussed "extensively" at step four. <u>Lewis</u>, 498 F.3d at 911.

Similarly, in <u>Maziarz</u>, the court indicated that so long as the ALJ considered at least one impairment severe and continued with the remaining steps, failure to consider a different impairment severe was not reversible error. <u>Maziarz</u>, 837 F.3d at 244.  In <u>Maziarz,</u> the ALJ noted the claimant's cervical condition and, though rejecting the severity of the claimant's alleged symptoms, took it into consideration in formulating the claimant's RFC and determining he was not capable of his past relevant work. <u>Maziarz</u>, 837 F.2d at 242.

Finally, in <u>Rutherford</u>, the claimant alleged the ALJ erred by failing to properly identify obesity as a severe impairment at step two.  <u>Rutherford</u>, 299 F.3d at 552.  The Third Circuit found no error because the claimant herself never claimed obesity as an impairment, and did not specify during her ALJ hearing how obesity contributed to her inability to work.  <u>Rutherford</u>, 399 F.3d at 553.  The ALJ's failure to incorporate the claimant's obesity into the equation at any of the five steps, therefore, was not error.  <u>Id.</u>  Conversely,

46

Ms. Perrin listed headaches as an impairment in her application materials (AR 384) and explained during her ALJ hearing that her headaches caused her to miss work at least three times per month.  AR  83.

Ms. Perrin cites Nicola v. Astrue, 480 F.3d 885, 886-87 (8th Cir. 2007), for the proposition that the failure to identify a severe impairment at step two is not harmless error but is instead grounds for reversal.  In Nicola, the severe impairment the claimant alleged the ALJ failed to identify was borderline intellectual functioning.  Nicola, 480 F.3d at 887.  The Eighth Circuit noted when such a diagnosis is supported by sufficient medical evidence, it should be considered severe.  Id.  The court held the ALJ's failure to identify the impairment as severe was not harmless error.  Id.  The court reversed and remanded the case to the commissioner for further proceedings.  Id.

As noted in Lund v. Colvin, 2014 WL 1153508 (D. Minn. Mar. 21, 2014), the district courts within the Eighth Circuit are not in agreement about the holding of Nicola.  Some courts have interpreted it to mean that an ALJ's erroneous step-two failure to include an impairment as severe warrants reversal and remand, even when the ALJ found other impairments to be severe and therefore continued sequential analysis.   Other courts have declined to interpret Nicola as establishing a per se rule that any error at step two is reversible error, so long as the ALJ continues with the sequential analysis.  See Lund 2014 WL 1153508 at *26 (gathering cases).  The central theme in the cases which hold reversal is not required is that "an error at step two may be harmless where the ALJ considers all of the claimant's impairments in the

47

evaluation of the claimant's RFC."  Lund, 2014 WL 1153508 at *26.   In the

absence of clear direction from the Eighth Circuit, this is the  course which has

generally been followed by this court.  See Chapman v.  Colvin, 2016 WL

8117951 at *25 (D.S.D. Dec. 16, 2016).

     Ms. Perrin argues that the ALJ's failure to consider her headaches as a

severe impairment is not harmless error in her case, because the ALJ's

analysis was completely silent as to what effect, if any, her headaches had

upon her RFC at step four.  The court therefore endeavors to determine

whether the ALJ erred by failing to categorize Ms. Perrin's headaches as a

severe impairment and if so, whether that error in this instance constitutes

reversible error under Nicola as interpreted through the lens of Lund.

     The "failure to consider a known impairment in conducting a step-four

inquiry is, by itself, grounds for reversal."  Spicer v. Barnhart, 64 Fed. Appx.

173, 178 (10th Cir. 2003).  See also Washington v. Shalala, 37 F.3d 1437,

1439-40 (10th Cir. 1994) ("failure to apply the correct legal standard . . . is

grounds for reversal.  We note that the ALJ failed to consider the Plaintiff's

[impairment] in conducting the step-four inquiry.  This failure, alone, would be

grounds for reversal.").   See also Pratt v. Sullivan, 956 F.2d 830, 834-35 (8th

Cir. 1992) (same).

     In this case, the ALJ acknowledged Ms. Perrin's headaches as a

legitimate medical impairment, but the court agrees that the reasons cited by

the ALJ for categorizing headaches as non-severe are not supported by

substantial evidence.  The first reason cited by the ALJ is a lack of treatment

for headaches.  AR 14. But Ms. Perrin frequently reported her headaches to her medical providers and/or sought treatment for them during the relevant time frame, including receiving medication and physical therapy.  <u>See</u> e.g.

- AR 526 (reported headaches to Dr. Watts in August, 2012);

- AR 544-46 (reported increased migraines to Dr. McElroy in February, 2013, after she tried avoiding meds to prevent rebound headaches.  Dr. McElroy prescribed flexeril and recommended a headache journal);

- AR 567 (in June, 2013, Ms. Perrin complained to Dr. Shafer at Community Health that she was having "almost daily" migraine headaches);

- AR 627-28 (in September, 2013, Ms. Perrin was seen at the Avera McKennan ER complaining of tremors in her right hand after having had headaches for two weeks.  The ER physician observed that the tremor resolved, and believed it may have been a caused by an atypical migraine or an incidental tremor, but did not believe it was a seizure);

- AR 565 (in September, 2013, Ms. Perrin saw Dr. Shafer for follow up on her migraines, after having been in the ER for the same. Dr. Shafer prescribed amitriptyline and physical therapy);

- AR 565 (in November, 2013, Ms. Perrin complained to Ekstrom at Community Health that she was having migraine headaches 2-3 times per week—he discontinued PT because it was not helping);

- AR 576-79 (reported severe migraine headache to Dr. McElroy in December, 2013, reporting she had recently been in the ER because of headaches.  She reported amitriptyline helped, but that she was still having migraines 3-4 times per week);

- AR 689-91 (in March, 2014, reported daily light-sensitive type headaches to Dr. McElroy and her amitriptyline was changed to nortriptyline);

- AR 685-86 (in May, 2014, reported daily headaches—sometimes migraines, sometimes regular headaches, to Dr. McElroy.  In response, Dr. McElroy increased Ms. Perrin's dosage of nortriptyline);

- AR 670-72 (in December, 2014, Ms. Perrin reported headaches to Dr. McElroy.  In response, Dr. McElroy changed Ms. Perrin's medication from nortriptyline to gabapentin);

- AR 802-804 (in January, 2015, Ms. Perrin again reported ongoing headaches to Dr. McElroy.  Dr. McElroy believed some of the headaches may be of a "rebound" type. As of that date, Ms. Perrin was taking gabapentin twice a day, and hydrocodone as needed, in addition to Excedrin Migraine.  Dr. McElroy believed that in addition to being "rebound" type headaches, some of Ms. Perrin's headaches may be related to high blood pressure, so she started Ms. Perrin on high blood pressure medication. AR 804);

- AR 758 (Ms. Perrin reported on August 14, 2015 that physical therapy had helped "some" with her headaches);

- AR 752 (in August, 2015, Ms. Perrin reported to Dr. McElroy that her headaches were coming back).

The next reason the ALJ categorized Ms. Perrin's headaches as non-severe was because Ms. Perrin "avoided" her headache medications, which the ALJ indicated meant that Ms. Perrin's headaches were not as limiting as she claimed they were.  AR 14.  But the medical record to which the ALJ referred in support of this assertion (AR 546) is Dr. McElroy's note dated February 25, 2013, wherein Ms. Perrin was complaining of *increased* migraine headaches, caused by her attempt to cut back on medications which caused a flare-up.  Id. Ms. Perrin explained to Dr. McElroy that her cut back on medications was *not* because her  migraines had subsided, but because she was attempting to reduce the rebound headaches referenced in Dr. McElroy's records.[5]

---

[5] Rebound headaches (medication-overuse headaches) are caused by regular, long-term use of medication to treat headaches, such as migraine.

Finally, the ALJ indicated he did not categorize Ms. Perrin's headaches as severe because there was no evidence in the record to indicate Ms. Perrin followed Dr. McElroy's February, 2013, advice to keep a headache journal.  But there is no suggestion anywhere in the record by any medical provider that keeping a headache journal would have had a significant effect upon the frequency of Ms. Perrin's headaches or upon her ability to function in the workplace.  See SSR 82-59 (benefits may not be denied for failure to follow medical advice unless the treatment is "clearly expected to restore the claimant's ability to engage in substantial gainful activity.").  Id. policy statement, Treatment Expected to Restore Ability to Work, p. 3.  For all of these reasons, the court concludes the ALJ's categorization of Ms. Perrin's headaches as non-severe is not supported by substantial evidence in the record.

The Commissioner argues that any error at step two was harmless.  This conclusion cannot be discerned, however, from the ALJ's written decision.  The

---

Pain relievers offer relief for occasional headaches. But if one takes them more than a couple of days a week, they may trigger rebound headaches.

It appears that any medication taken for pain relief can cause rebound headaches, but only if one already has a headache disorder. Pain relievers taken regularly for another condition, such as arthritis, have not been shown to cause rebound headaches in people who never had a headache disorder.

Rebound headaches usually stop when one stops taking the pain medication. It's tough in the short term, but your doctor can help beat rebound headaches for long-term relief. https://www.mayoclinic.org/diseases-conditions/rebound-headaches/basics/definition/con-20024096  (Last checked November 13, 2017).

ALJ's recitation of  Ms. Perrin's RFC (recited verbatim above on page 4 of this opinion) did not include any mention of whether Ms. Perrin's functional capacity was affected at all by limitations presented by Ms. Perrin's headaches. Because the ALJ's own analysis deemed Ms. Perrin's headaches a medically determinable impairment, the ALJ was required to consider the effects of Ms. Perrin's headaches when formulating her RFC—even though the ALJ considered the headaches a non-severe impairment.

But because the headaches were not mentioned at all in the ALJ's discussion regarding the RFC, it is impossible to determine whether any limitation within the RFC was attributed to Ms. Perrin's headaches.  In the part of his written decision wherein he determined Ms. Perrin's headaches were a non-severe impairment, the ALJ cited the reasons he did not believe Ms. Perrin's headaches more than "minimally" limited her ability to work. AR 14. Ms. Perrin testified she had migraines which caused her to miss work "at least" three times a month.  AR 83.  Because the headaches were accepted by the ALJ as a medically determinable impairment but not otherwise discussed, the court is left to speculate about what the ALJ considered a "minimal" effect on Ms. Perrin's ability to work.  The ALJ did not discount the existence of migraines altogether because he accepted them as a medically determinable impairment.

Perhaps a minimal effect on her ability to work means only one migraine per month, or perhaps it means two instead of three.   Or perhaps it means she can only perform jobs which require limited concentration (Ms. Perrin

52

described in her hearing testimony that her "regular" as opposed to migraine
headaches are an annoyance but that she could remain on the job when she
had a non-migraine headache, whereas her migraines rendered her unable to
function at all). But the RFC analysis makes no mention of *any* affect that
Ms. Perrin's migraine headaches, or lack thereof, on Ms. Perrin's ability to
work. The court is left to speculate, therefore, about why this is so. This case
must be remanded for clarification of this issue. Only then can this court
sufficiently review the Commissioner's decision. Nicola, 480 F.3d at 887;
Parker-Grose v. Astrue, 462 Fed. Appx. 16 (2d Cir. 2012) (Commissioner's
assertion that failure to find mental impairment severe at step two was
harmless was "unavailing" because "having found that any functional
limitations associated with [claimant's] mental impairment were mild and only
minimally affected her capacity to work, the ALJ did not take these restrictions
into account when determining her [RFC]."

### 2. Whether The Commissioner's Formulation of Ms. Perrin's RFC is Supported by Substantial Evidence?

Next, Ms. Perrin asserts the Commissioner's formulation of her residual
functional capacity (RFC) is not supported by substantial evidence. Residual
functional capacity is "defined as what the claimant can still do despite his or
her physical or mental limitations." Lauer v. Apfel, 245 F.3d 700, 703 (8th
Cir. 2001) (citations omitted, punctuation altered). "The RFC assessment is an
indication of what the claimant can do on a 'regular and continuing basis'
given the claimant's disability. 20 C.F.R. § 404.1545(b)." Cooks v. Colvin,

2013 WL 5728547 at *6 (D.S.D. Oct. 22, 2013). The formulation of the RFC has been described as "probably the most important issue" in a Social Security case. McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982), abrogation on other grounds recognized in Higgins v. Apfel, 222 F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must "consider the combination of the claimant's mental and physical impairments." Lauer, 245 F.3d at 703. Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all the relevant evidence . . . a claimant's residual functional capacity is a medical question." Id. (citations omitted). "Some medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." Id. (citations omitted). Finally, "[t]o find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Reed, 399 F.3d at 923 (citations omitted, punctuation altered).

In support of this assignment of error, Ms. Perrin asserts the ALJ made four mistakes. They are discussed below.

### a.    Whether The Commissioner Properly Evaluated the Medical Evidence?

First, Ms. Perrin asserts the ALJ's assignment of weight to the medical opinions was flawed. Specifically, the ALJ assigned "significant weight" to the opinions of the state agency physicians who never examined or treated

Ms. Perrin, but who only reviewed her records.  AR 17.  These physicians reviewed the records of Ms. Perrin's treating physicians and, based upon their review of the records, offered their opinions about Ms. Perrin's physical and mental abilities to function in the workplace.  AR 104-112, 137-148.

On the other hand, the ALJ assigned "little weight" to the opinion of Dr. McElroy, who had been Ms. Perrin's treating physician for several years. Dr. McElroy also offered her opinion, based upon her treatment of Ms. Perrin, about Ms. Perrin's ability to function in the workplace.  AR 699-703, 904-911. Dr. McElroy's opinion about Ms. Perrin's ability to function was quite different than the state agency physicians' opinions.

Ms. Perrin first asserts the ALJ wrongly gave significant weight to the opinions of the state agency physicians without addressing serious errors or inconsistencies in their opinions.  For example, she asserts at the initial level, the state agency physician offered as a reason for the exertional limits he assigned for Ms. Perrin that she had "probable fibromyalgia and chronic back pain" (AR 110) despite the fact that neither he (AR 107) nor any of Ms. Perrin's treating physicians had ever identified fibromyalgia as an impairment with which Ms. Perrin was afflicted.[6]  The opinion of the first state agency physician

_____

[6] On August 7, 2012, Ms. Perrin reported to Dr. McElroy that she was concerned she "might" have fibromyalgia.  It does not appear, however, that Dr. McElroy or any other physician ever evaluated Ms. Perrin for fibromyalgia or diagnosed that condition.

55

regarding fibromyalgia was affirmed by the second state agency opinion on reconsideration (AR 145).

Next, Ms. Perrin notes that the state agency physicians at both the initial (AR 110) and on reconsideration (AR 146) indicated that "depression is a problem which may be contributing to her symptoms." Though the ALJ gave "significant weight" to the opinions of these state agency experts, and though the ALJ accepted Ms. Perrin's depression as a medically determinable impairment, he did not factor depression into her ability to function in the workplace when he formulated her RFC.

Ms. Perrin also faults the ALJ for giving "great weight" to the state agency physician at the reconsideration level because that physician found Ms. Perrin had "unlimited" balance (AR 145) but then on the very same page explained that she "has balance issues with climbing due to Meniere's." Id. The ALJ never explained these conflicting findings regarding what the ALJ found was a severe medically determinable impairment (AR 13) and for which he imposed functional restrictions of no work on ladders, scaffolds or ropes and frequent balancing but only occasional crouching, kneeling, stooping and crawling. AR 15.

Additionally, on reconsideration, the state agency physician indicated he gave "great weight" to the opinions expressed by Ms. Perrin's treating physician, expressed in her note dated February 25, 2013. See AR 144. Ms. Perrin points out, however, that Dr. McElroy's note of that date does not contain any opinion about functional limitations. See AR 544, 546, 548.

Instead, on that visit to Dr. McElroy, Ms. Perrin visited about her ears popping, her sciatic nerve pain down her legs, and her migraine headaches.  Id.  She also discussed her concerns about diabetes and her balance problems caused by Meniere's disease.  Id.  Dr. McElroy prescribed the use of a four-pronged cane, advised Ms. Perrin to start a headache journal, and prescribed flexeril for her headaches.  AR 548.   Ms. Perrin asserts that if anything, the state agency physician's assignment of "great weight" to Dr. McElroy's medical note of this date should have indicated support for disability rather than the RFC ultimately formulated by the state agency physician and adopted by the ALJ.

The Commissioner counters that the state agency physicians' opinions are supported by substantial evidence in the record, because there is no objective basis for the extreme limitations alleged by Ms. Perrin (and later supported by Dr. McElroy in her functional capacity analysis which was issued in January and then reaffirmed in September of 2015—See AR 699-703, 904-911).  Further, the Commissioner argues, the state agency medical consultants' opinions are wholly consistent with Ms. Perrin's extensive activities of daily living.  In sum, the Commissioner argues, the state agency consultants' opinions are more consistent with the medical evidence as a whole than are Dr. McElroy's opinions.

The ALJ gave "little weight" to the opinion of Ms. Perrin's treating physician, Dr. McElroy.  Dr. McElroy issued opinions on January 13, 2015, and then again on September 14, 2015.  The September, 2015, statement reaffirmed the limitations set forth in the January statement.  AR 699-703,

57

904-05.   The ALJ rejected Dr. McElroy's opinion for two stated reasons:  First, her opinions were offered before Ms. Perrin saw a neurologist (Dr. Boyle) and underwent four physical therapy sessions at his advice.  The ALJ opined the physical therapy improved Ms. Perrin's balance issues and dizziness issues.  See ALJ's written decision, AR 17. Second, the ALJ indicated that Dr.McElroy's opinions were not sufficiently supported by objective findings to support the limitations imposed.  Id.

Ms. Perrin asserts the ALJ erred in his assessment of Dr. McElroy's opinions because, by concluding that she enjoyed lasting improvement from the physical therapy sessions recommended by Dr. Boyle, the ALJ inappropriately drew his own medical inferences from the records without relying on any other expert medical opinion.  Further, Ms. Perrin asserts, the ALJ simply ignored the objective evidence that *did* support Dr. McElroy's conclusions.  Ms. Perrin argues that requiring Dr. McElroy to recite the supporting evidence within the form in which she stated Ms. Perrin's functional limitations would have been redundant because such evidence is replete within Dr. McElroy's own records and the medical records of  Ms. Perrin's other medical providers.

The Commissioner counters that the ALJ correctly concluded Dr. McElroy's opinions were not adequately supported by the medical record. For example, Ms. Perrin's 2008 videoonystagmography (VNG) test was normal (AR 600, 616) and after her four physical therapy sessions in 2015, she could ambulate without assistance and showed no gait abnormalities (AR 888-89).

58

Her 2012 MRI of the thoracic and lumbar spine showed degenerative changes, but no nerve root impingement. AR 516. Further, the Commissioner asserts that Dr. McElroy did not sufficiently explain the basis for the extreme limitations she expressed in her opinion statements, and the limitations Dr. McElroy did impose appeared to be based upon the limitations Ms. Perrin requested rather than those which were actually necessary.

Finally, Ms. Perrin asserts the ALJ should have given weight to the functional restrictions expressed by another treating physician (Dr. Watts) who supported the opinions expressed by Dr. McElroy. Dr. Watts saw Ms. Perrin following an epidural injection in June, 2012. On June 13, 2012, Dr. Watts instructed that, for thirty days following the injection, Ms. Perrin should not lift more than ten pounds and should not work more than eight hours per day. AR 513-514.

The Commissioner counters that the ALJ did not err when he did not consider Dr. Watts' opinion as consistent with or supportive of Dr. McElroy's opinion. The Commissioner asserts that because the restrictions imposed by Dr. Watts predated Ms. Perrin's alleged date of onset, and were in any event only meant to be temporary, they did nothing to bolster the much more restrictive limitations imposed nearly three years later by Dr. McElroy.

Medical opinions from acceptable medical sources are considered evidence which the ALJ will consider, along with all relevant record evidence, in determining whether a claimant has an impairment, the nature and severity of

the impairment, and the claimant's RFC.  See 20 C.F.R. § 404.1527(a)(2).  All

medical opinions are evaluated according to the same criteria, namely:

> --whether the opinion is consistent with other evidence in
>   the record;
>
> --whether the opinion is internally consistent;
>
> --whether the person giving the medical opinion examined
>   the claimant;
>
> --whether the person giving the medical opinion treated the
>   claimant;
>
> --the length of the treating relationship;
>
> --the frequency of examinations performed;
>
> --whether the opinion is supported by relevant evidence,
>   especially medical signs and laboratory findings;
>
> --the degree to which a nonexamining or nontreating
>   physician provides supporting explanations for their
>   opinions and the degree to which these opinions consider
>   all the pertinent evidence about the claim;
>
> --whether the opinion is rendered by a specialist about
>   medical issues related to his or her area of specialty; and
>
> --whether any other factors exist to support or contradict the
>   opinion.

See 20 C.F.R. § 404.1527(a)-(f); Wagner v. Astrue, 499 F.3d 842, 848 (8th

Cir. 2007).

The Commissioner will give controlling weight to the opinion of a treating

source as to the nature and severity of a claimant's impairment if (1) the

opinion is well-supported by medically acceptable clinical and laboratory

diagnostic techniques, and (2) the opinion is not inconsistent with the other

substantial evidence in the record.  20 C.F.R. § 404.1527(c)(2); <u>Nowling v.</u>
<u>Colvin</u>, 813 F.3d 1110, 1122 (8th Cir. 2016).  "A treating physician's opinion,
however, 'does not automatically control or obviate the need to evaluate the
record as a whole.' " <u>Id.</u> at 1122-23 (quoting <u>Hogan v. Apfel</u>, 239 F.3d 958, 961
(8th Cir. 2001)).  If the opinion of the treating physician is inconsistent, or if
other medical evaluations are "supported by better or more thorough medical
evidence" the ALJ may be entitled to discount or even disregard a treating
physician's opinion.  <u>Nowling</u>, 813 F.3d at 1123; <u>House v. Astrue</u>, 500 F.3d
741, 744 (8th Cir. 2007); <u>Wagner</u>, 499 F.3d at 853-54; <u>Guilliams v. Barnhart</u>,
393 F.3d 798, 803 (8th Cir. 2005); <u>Bentley v. Shalala</u>, 52 F.3d 784, 786 (8th
Cir. 1995).  "The opinion of an acceptable medical source who has examined a
claimant is entitled to more weight than the opinion of a source who has not
examined a claimant." <u>Lacroix v. Barnhart</u>, 465 F.3d 881, 888 (8th Cir. 2006)
(citing 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1)); <u>Shontos v. Barnhart</u>, 328
F.3d 418, 425 (8th Cir. 2003); <u>Kelley v. Callahan</u>, 133 F.3d 583, 589 (8th Cir.
1998)).  In evaluating a treating physician's opinion, the ALJ must "always give
good reasons" supporting his decision of the weight afforded that opinion.
<u>Nowling</u>, 813 F.3d at 1123; <u>Reed</u>, 399 F.3d at 921; 20 C.F.R. § 404.1527.

    When opinions of consulting physicians conflict with opinions of treating
physicians, the ALJ must resolve the conflict.  <u>Wagner</u>, 499 F.3d at 849.
Generally, the opinions of non-examining, consulting physicians, standing
alone, do not constitute "substantial evidence" upon the record as a whole,
especially when they are contradicted by the treating physician's medical

opinion.  Wagner, 499 F.3d at 849; Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004) (citing Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999)). However, where opinions of non-examining, consulting physicians along with other evidence in the record form the basis for the ALJ's RFC determination, such a conclusion may be supported by substantial evidence.  Harvey, 368 F.3d at 1016.  Also, where a nontreating physician's opinion is supported by better or more thorough medical evidence, the ALJ may credit that evaluation over a treating physician's evaluation.  Flynn v. Astrue, 513 F.3d 788, 793 (8th Cir. 2008)(citing Casey v. Astrue, 503 F.3d 687, 691-692 (8th Cir. 2007)).

        The court begins with whether the ALJ's assignment of "great weight" to the opinions of the state agency physicians is supported by substantial evidence in the record.  The ALJ adopted the opinion of the state agency physicians even though both state agency physicians indicated the restrictions they imposed were based in part upon the diagnosis of a medical impairment that Ms. Perrin did not have.  Ms. Perrin opines that, because the state agency physicians indicated in their reports that they imposed restrictions based upon a medical impairment with which she had never been diagnosed, the state agency physician at the initial level reviewed the wrong file when he formed his opinions and that his opinion was (at least in part) adopted by the state agency physician on reconsideration.  The ALJ did not address this discrepancy. Additionally, the ALJ did not reconcile how the state agency physician at the reconsideration level could have given "great weight" to the opinion of

62

Ms. Perrin's treating physician (Dr. McElroy), yet reach such a different conclusion than Dr. McElroy did about Ms. Perrin's functional abilities.

The ALJ is obligated to resolve the conflict between Dr. McElroy's opinion and the opinion of the state agency physicians, and then give good reasons for rejecting Dr. McElroy's opinions. Wagner, 499 F.3d at 849; Nowling, 813 F.3d at 1123; Reed, 399 F.3d at 921; 20 C.F.R. § 404.1527. The ALJ obviously resolved the above-stated conflicts in favor of the state agency physicians, but his written decision is silent about the above-stated crucial issues. Remand is required.

Ms. Perrin asserts the ALJ erred by failing to consider the restrictions imposed by Dr. Watts in his note dated June 13, 2012. This claim is rejected. Dr. Watts' note dated June 13, 2012 precedes the time frame for which Ms. Perrin sought benefits, and the restrictions he imposed were temporary (30 days). Ms. Perrin claimed disability beginning on October 1, 2012. AR 11. The Social Security regulations require the Commissioner to consider all evidence submitted by a claimant when making the disability determination. 20 C.F.R. § 404.1520(a)(3). While medical evidence which predates the alleged date of onset "is of little relevance," Carmickle v. Commissioner of Social Security Administration, 533 F.3d 1155, 1165 (9th Cir.2008), failure to consider it at all may be reversible error. Carpenter, 537 F.3d at 1266. Medical records which pre-date the alleged date of onset are properly considered not for the purpose of determining whether Ms. Perrin is disabled during the relevant time period, but to provide a more accurate understanding of her medical

63

background.  See e.g. Walker v. Astrue, 2012 WL 369453 at *1 (S.D. W.Va. Feb.
3, 2012).  The ALJ's failure to specifically mention a temporary restriction
which pre-dated Ms. Perrin's alleged date of onset when determining
Ms. Perrin's RFC did not constitute reversible error in this instance.

     Next, the court reviews Ms. Perrin's assertion that the ALJ's assignment
of "little weight" to Dr. McElroy's opinion is not supported by substantial
evidence.  The ALJ's stated reasons for rejecting Dr. McElroy's opinions were
that they lacked objective support in the  medical records.  Ms. Perrin asserts
that the objective support for Dr. McElroy's opinions can be found in the record
as a whole, and "there is no reason for the treatment notes and subjective and
objective findings which supported [Ms. Perrin's] diagnosed impairments to be
replicated within a medical source statement."  See Ms. Perrin's opening brief,
Docket 14, p. 12.

     Ms. Perrin argues that there are objective findings in the record to
support Dr. McElroy's functional restrictions.  She cites an MRI obtained in
June, 2012, by Dr. Watts (AR 515-517).  The MRI revealed: Degenerative grade
1 spondylolisthesis at L4-L5 secondary to facet arthropathy with minimal
broad-based annular protrusion and no nerve root impingement.  Mild spinal
stenosis.  Mild annular disc protrusions at T11-T12 and T12-L1 with no
impression upon the thoracic spinal cord or abnormal signal.  Changes of mild
multi-level degenerative spondylosis and facet arthropathy.  AR 516.
Ms. Perrin also cites the epidural injection she received after Dr. Watts
reviewed the MRI as an objective finding in support of Dr. McElroy's functional

64

restrictions.  The epidural injection occurred on June 18, 2012, (AR 637-38).

Ms. Perrin cites her physical therapy sessions (AR 579, 853-54, 876-881)

which she claims were not successful in resolving her pain as objective

evidence of her functional restrictions.  Ms. Perrin argues that because all of

this objective evidence is specifically mentioned in Dr. McElroy's notes (AR 527,

578-79) it need not be regurgitated in her functional capacity opinion letter.

Ms. Perrin also asserts Dr. McElroy's opinions are supported by other

record evidence such as Dr. Shafer's treatment records, including his decision

to prescribe a four-pronged cane and narcotic pain medication (AR 557).

Dr. Shafer also completed the necessary paperwork for Ms. Perrin to obtain a

handicap parking permit.  AR 569.  Ms. Perrin asserts Dr. McElroy's opinions

are also supported by the opinion of a different state agency physician

(Dr. Erickson) who used the same criteria as does the Social Security

Administration to determine that Ms. Perrin was disabled.  This finding entitled

Ms. Perrin to Medicaid benefits under the South Dakota Medical Assistance for

Workers with Disabilities (MAWD) effective July 1, 2014.  AR 704-05.

Ms. Perrin asserts that Dr. Shafer's medical records and the MAWD records at

the very least presented a general consistency which, absent controlling weight,

supported a finding that Dr. McElroy's opinions were entitled to greater weight

than were the opinions of the state agency physicians—the opinions ultimately

adopted by the ALJ.

In Cline v. Colvin, 771 F.3d 1098 (8th Cir. 2014), the claimant asserted

the ALJ erred by failing to give her treating physician (Dr. Allen) controlling

weight.  Id. at 1103.  The Eighth Circuit disagreed, because Dr. Allen's "cursory
checklist statement" included significant impairments and limitations that
were absent from his own treatment notes and from the claimant's medical
records.  Id. at 1104.  The court noted that while a checklist evaluation "can
be" a source of objective medical evidence, a treating physician's opinion
statement is properly discounted when the limitations on the form *stand alone*
and were *never mentioned* the  physician's own records of treatment nor
supported by any objective testing or reasoning.  Id.

In Cline the claimant conceded that Dr. Allen's own treatment records
were devoid of clinical findings to support the limitations he imposed.  Id. at
1104.  But, the claimant argued, the ALJ should have known or realized that
there were other medical records in the file from other doctors to support the
limitations.  Id.  The court rejected this reasoning:  "The commissioner need
not patch the holes in a treating physician's porous opinion nor give the
opinion controlling weight under such circumstances.  See 20 C.F.R.
§ 416.927(d)(2); Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996) ("A
treating physician's opinion deserves no greater respect than any other
physician's when [it] consists of nothing more than vague, conclusory
statements.").  Cline, 771 F.3d at 1104.  See also Wildman v. Astrue, 596 F.3d
959, 964 (8th Cir. 2010) (condemning "checklist" forms which cite no medical
evidence and provide little to no elaboration, and indicating a treating
physician's opinion which is contained upon a "checklist" form and which is

66

vague and conclusory is entitled to no greater weight than any other physician's opinion).

Dr. McElroy's functional capacity opinion statement is primarily a "check the box" document.  AR 699-701.  She was given opportunity to explain a few of her answers, however, and did so.  Id. And unlike Cline, Dr. McElroy's own treatment notes did at least contain reference to and incorporate the findings of the outside physicians who *did* conduct the objective testing upon which she relied to treat Ms. Perrin.  However, when given the opportunity to specifically refer to such other or objective outside treatment on the last page of the opinion statement, Dr. McElroy did not do so.  AR 703.  At least to some extent, then, the ALJ was left to "patch the holes" in Dr. McElroy's opinion.

Interestingly, the state agency physicians specifically noted at least some of objective medical evidence which Ms. Perrin argues supports Dr. McElroy's opinion—but the state agency physicians reached a different conclusion based upon that evidence.  Under the "Analysis of Evidence" section of the form, the state agency physician at the initial consideration level (AR 116) took specific note of Ms. Perrin's June, 2012, MRI and the epidural injection that was performed as a result of the MRI findings.  Id. *Despite* these objective findings, the state agency physician imposed functional limitations which were less restrictive than those imposed by Dr. McElroy.

The state agency physicians based their functional limitations at least in part upon a medical impairment that no physician has ever diagnosed—raising the question of whether they were reviewing the correct file, at least in part.

They also gave "great weight" to Dr. McElroy's records, but reached a different conclusion than she did.[7]  Finally, the state agency physicians relied upon the same objective evidence as did Dr. McElroy, but imposed far less restrictive limitations.  Neither they nor the ALJ explained how the state agency physicians could have given great weight to Dr. McElroy's "opinion" while at the same time issuing one of their own that was completely at odds with it.

In this case, the forms submitted by neither the state agency physicians nor Dr. McElroy are particularly enlightening for the reasons explained above. But because their opinions conflict, it was the ALJ's duty to resolve the conflict in a manner which reviewing courts can interpret.  This court cannot determine whether the ALJ erred by failing to give controlling or greater weight to Dr. McElroy's opinion in the absence of  better insight on how these inconsistencies were resolved by the ALJ.  For these reasons, the case must be remanded.

### b.    Whether The Commissioner Properly Incorporated Ms. Perrin's Mental Limitations Into the RFC?

Next, Ms. Perrin asserts the ALJ's formulation of her RFC is not supported by substantial evidence because her mental limitations were not properly incorporated into her RFC.  Ms. Perrin notes that the ALJ accepted

------------------------

[7] The state agency form opinion refers to the record of Dr. McElroy's to which the state agency physician allegedly gave "great weight" as a treating physician's "opinion evidence," but the Dr. McElroy's record to which the form refers is dated February 25, 2013, and Dr. McElroy did not offer her functional limitation opinions until January and September of 2015.

her depression as a non-severe impairment, but did not mention the comments of the state agency physicians (whose functional capacity assessments the ALJ gave great weight), both of whom commented that Ms. Perrin's depression may be contributing to her limitations.  AR 14.   Further, Ms. Perrin argues, the ALJ did not mention depression at all during at step four, where he ALJ formulated the RFC.

After the ALJ hearing but before the ALJ issued his written decision, Ms. Perrin's treating physician (Dr. McElroy) issued a supplemental opinion (AR 926-27) which indicated that Ms. Perrin's ability to maintain attention and concentration and her ability to maintain regular attendance would be "moderately" limited by the combination of her chronic pain and depression. The ALJ rejected this opinion evidence as "grossly out of proportion with the treatment notes," (AR 18) because Ms. Perrin had received very little treatment for depression.  Ms. Perrin asserts that because both jobs the ALJ ultimately found she was capable of performing (mailroom supervisor and policy holder-information clerk) are defined in the Dictionary of Occupational Titles (DOT) as having a specific vocational preparation (SVP) level[8] of 6 and a general

---

[8] SVP defines the time required for the typical worker to learn the techniques, acquire the information, and develop the facility needed for the average performance of a job.  SVP of 6 requires over one year and up to two years.  DICTIONARY OF OCCUPATIONAL TITLES, US DEPARTMENT OF LABOR, REVISED 4TH ED. (1991) at 1009.

educational development (GED) reasoning level[9] of 4, the ALJ should have explained whether Ms. Perrin's non-severe depression would have precluded or impacted her ability to perform these highly skilled jobs.

Though Ms. Perrin listed depression in her disability application (AR 384) it was not a condition for which she regularly treated with Dr. McElroy or anyone else, nor for which her treating physician's first two functional capacity opinion letters mentioned any restrictions whatsoever. AR 699-703, 904-05. Ms. Perrin did not seek treatment from any mental health providers during the time from her alleged date of onset through the hearing date. Instead, Dr. McElroy prescribed a variety of anti-depressant medications, which Ms. Perrin sometimes took and sometimes did not. AR 567 (told Dr. Shafer she had quit taking her sertraline).[10] Dr. McElroy's notes, however, indicate that when Ms. Perrin took her Zoloft, it worked. AR 546. Medical conditions that can be well-controlled by medication are not disabling. Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (epilepsy not a disabling condition because it was controllable by medication).

------

[9] The GED reasoning level component of each DOT occupation specifies those aspects of formal and informal education required of a worker for satisfactory job performance. A GED reasoning level of 4 requires the worker to be able to apply principles of rational systems to solve practical problems and deal with a variety of concrete variables in situations where only limited standardization exists. DICTIONARY OF OCCUPATIONAL TITLES, US DEPARTMENT OF LABOR, REVISED 4TH ED. (1991) at 1010.

[10] Sertraline is the generic for Zoloft. https://www.drugs.com/sertraline.html (last checked November 20, 2017).

Though Ms. Perrin claimed during the hearing that Dr. McElroy had referred her to a counselor to help deal with her depression (AR 86-87), and despite Dr. McElroy's post-hearing supplemental opinion letter regarding the combined effect of Ms. Perrin's depression and physical impairments, no counseling records were ever submitted to the ALJ or to the Appeals Council.

Ms. Perrin argues her depression should have been considered in her RFC because the state agency physicians both commented that "depression is a problem which may be contributing to her symptoms." That comment, however, was included in the portion of the state agency physician's RFC form which was provided for "additional explanation" for the RFC that they had assigned. AR 120, 133. This suggests that the state agency physicians had already included depression as a factor when assigning their physical restrictions. Further, at the initial and reconsideration levels, the psychiatric review technique (PRT) was performed, and the reviewing physician found that the "B" criteria were not met because Ms. Perrin had only mild difficulty in social functioning and in maintaining concentration, persistence or pace. AR 118, 129. For purposes of evaluating mental disorders under the "Listings," mental disorders are divided into eleven categories. See Appendix 1, Subpart P, Part 404. Listings 12.02 through 12.12. Some of the disorders have paragraphs A & B criteria, some have A, B, & C criteria. In order to be entitled to benefits, the claimant must meet the criteria listed for the designated categories for their claimed disorder. Ms. Perrin was evaluated for category 12.04, affective disorders. AR 130. The "B" criteria consist of restriction of

activities of daily living, difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence or pace, and repeated episodes of decompensation, each of extended duration.  Id.   The state agency physician found Ms. Perrin had mild difficulties in social functioning and in maintaining concentration, persistence and pace, but otherwise no evidence of the "B" criteria.  Id.

In the section provided for further explanation for the PRT, the physician noted that Zoloft (sertraline) managed Ms. Perrin's symptoms, and the drug had been discontinued but then restarted when Ms. Perrin's symptoms worsened.  Her medical assessments had revealed no problems with personal care or with interpersonal interactions, other than those related to her lack of sleep.  Ms. Perrin had no history of psychiatric hospitalizations or any mental health counseling.  AR 130.  Therefore, the state agency physician found Ms. Perrin's reported mental impairment "non-severe."  AR 130.

Ms. Perrin's assertion that her mental impairments were not discussed during the ALJ's formulation of her RFC is incorrect.  On the contrary, the ALJ specifically described why he did not assign any restrictions which were connected to Ms. Perrin's non-severe mental impairment to Ms. Perrin's ability to work and why he did not give Dr. McElroy's supplemental opinion regarding the functional limitations Ms. Perrin had which were specifically related to her alleged depression any weight (AR 18). This court is not persuaded that the ALJ erred by failing to specifically include the effects of Ms. Perrin's alleged mental

impairments in her RFC.  This portion of Ms. Perrin's assignment of error should therefore be rejected.

> **c.    Whether the Commissioner Failed to Consider Accommodations Ms. Perrin Received in Her Previous Part-Time Job?**

Ms. Perrin also asserts the ALJ's formulation of her RFC is flawed because he failed to correctly consider an element of the credibility analysis pursuant to 20 C.F.R. § 404.1529 and Polaski[11] before he proceeded to formulate her RFC.  "When an ALJ reviews a claimant's subjective allegations of pain and determines whether the claimant and [her] testimony are credible, the ALJ must examine the factors listed in Polaski and apply those factors to the individual."  Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996).  See also Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529(c)(3).  In this case, the ALJ's credibility analysis begins on page fifteen of his written decision (AR 16).  It applies some of the Polaski factors and explains how they apply to Ms. Perrin.  AR 16-18.  The ALJ is not required to "explicitly discuss *each* Polaski factor in a methodical fashion" but rather it is sufficient if he "acknowledge[s] and consider[s] those factors before discounting [the claimant's] subjective complaints of pain."  Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996) (emphasis added).

---

[11] Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

The appropriate factors to be considered when evaluating whether a claimant's subjective complaints are consistent with the evidence as a whole are: (1) the objective medical evidence; (2) the claimant's daily activities; (3) the duration, frequency and intensity of pain; (3) dosage and effectiveness of medication; (4) precipitating and aggravating factors; (5) functional restrictions; (6) the claimant's prior work history; (7) observations by third parties; (8) diagnosis by treating and examining physicians; and (9) claimant's complaints to treating physicians.  See Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001); Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993).

The ALJ did not explicitly cite Polaski but did cite 20 C.F.R. § 404.1529.  He discussed Ms. Perrin's previous employment and the fact that he took her part-time work at Best Buy and the bingo hall into "consideration" in determining her RFC.  AR 13.  Ms. Perrin argues the ALJ never mentioned her claim that though she worked part-time at Best Buy and the bingo hall, she received accommodations at both jobs which allowed her to continue working as long as she did.  Ms. Perrin also alleges the ALJ failed to consider the letters she submitted from her co-workers which bolstered her claims about the problems she had at Best Buy and the bingo hall, as well as the special treatment she received at both places.

Ms. Perrin claims she was allowed to take extra breaks, sit down, and miss more work than is normally allowed at Best Buy.  She also claims that while working at the bingo hall, she was allowed to alternate between walking and sitting to accommodate her pain.  Contrary to Ms. Perrin's assertion,

74

however, it appears the ALJ did take these claims into consideration when determining her credibility and ultimately her RFC.

For example, in explaining in part why he rejected Ms. Perrin's pain complaints and Dr. McElroy's limitations, the ALJ noted that, contrary to her hearing testimony, Ms. Perrin told Dr. McElroy in August, 2015 that her work required her to walk *the entire duration of her four hour shift, four days per week*. AR 18, 751. This directly contradicts Ms. Perrin's claim of special accommodations being made for her at work. The ALJ noted "in all, this suggests that the claimant retains a higher level of physical functioning than she alleges." AR 18.

Ms. Perrin also asserts the ALJ erred by failing to acknowledge the letters she submitted from her friends and co-workers which substantiated her claims regarding the troubles she had at Best Buy and the bingo hall, and to some extent, the extra consideration she received at those work places. An ALJ is "not required to accept all lay testimony . . . [but] it is almost certainly error to ignore it altogether." Willcockson v. Astrue, 540 F.3d 878, 881 (8th Cir. 2008); Smith v. Heckler, 735 F.2d 312, 316-17 (8th Cir. 1984) (ALJ's failure to mention three lay witnesses' statements suggested that he overlooked them altogether). But, the ALJ may discredit third-party testimony on the same grounds as he discounts the claimant's testimony. Black v. Apfel, 143 F.3d 383, 387 (8th Cir. 1998). In cases where the evidence which leads the ALJ to discredit the claimant's testimony also discredits the third-party testimony, it

75

is not necessarily reversible error for the ALJ to fail to discuss the third-party testimony.  <u>Buckner v. Astrue</u>, 646 F.3d 549, 559-60 (8th Cir. 2011).

In this case, contrary to Ms. Perrin's claims, the ALJ *did* specifically discuss the letters of support received from Ms. Perrin's friends/co-workers. <u>See</u> AR 18.  He gave them "some" weight, but gave the contrary evidence in the record "greater" weight.  <u>Id.</u>  Because the ALJ found Ms. Perrin to be only partially credible, the ALJ likewise found the third-party statements to be only partially credible.  <u>Id.</u>   The ALJ did not err, therefore, by failing to acknowledge the third-party statements because he did not ignore them but instead found them less than credible for the same reasons he found Ms. Perrin's testimony on this subject less than credible.  <u>Willcockson</u>, 540 F.3d at 881; <u>Black</u>, 143 F.3d at 387.

> **d.   Whether the Commissioner Gave Proper Consideration to Ms. Perrin's Qualification for The South Dakota Medical Assistance For Workers With Disabilities Program?**

Finally, Ms. Perrin asserts the ALJ erred in formulating her RFC because he did not properly consider the evidence that she had already been approved for South Dakota Medicaid benefits through the South Dakota Medical Assistance for Workers with Disabilities (MAWD) program.  Ms. Perrin asserts that this evidence should have been considered as other medical opinion evidence of record which was consistent with Dr. McElroy's opinion evidence regarding Ms. Perrin's functional limitations.

The ALJ discussed this evidence on page eight of his written decision (AR 18).  The ALJ dismissed the relevance of this finding, however, in three

sentences.  The ALJ stated "a finding of disability herein is one reserved to the Commissioner, and criteria used to render a finding of disabled for purposes of the MAWD program differ from criteria required by the Social Security Act. Here, the undersigned is required to determine the claimant's function-by-function limitations.  The MAWD determination provides no assistance with this determination and it receives very little weight."  AR 18.

Certain ultimate issues are reserved for the Agency's determination. 20 C.F.R. § 404.1527(d).  Any medical opinion on one of these ultimate issues is entitled to no deference because it "invades the province of the Commissioner to make the ultimate disability determination."  House, 500 F.3d at 745 (citing Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002)). See 20 C.F.R. § 404.1527(d)(3).  The ultimate issues reserved to the Agency are as follows:

1.    whether the claimant is disabled;

2.    whether the claimant is able to be gainfully employed;

3.    whether the claimant meets or exceeds any impairment in the Listing of Impairments (appendix 1 to subpart P of part 404 of 20 C.F.R.);

4.    what the claimant's RFC is; and

5.    what the application of vocational factors should be.

See 20 C.F.R. § 404.1527(d)(1) and (2); see also Wagner, 499 F.3d at 849 (the ALJ "need not adopt the opinion of a physician on the ultimate issue of a claimant's ability to engage in substantial gainful employment.") (quoting Qualls v. Apfel, 158 F.3d 425, 428 (8th Cir. 1998)).  The RFC determination is

77

specifically noted to be one of those determinations that is an ultimate issue for the Agency to determine.  20 C.F.R. § 404.1527(d)(2); <u>Cox</u>, 495 F.3d at 619-620.

Also, the version of 20 C.F.R. § 404.1504 that was in effect on the date Ms. Perrin's case was decided (October, 2015), explains that

> A decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind.  We must make a disability or blindness determination based on social security law.  Therefore, a determination made by another agency that you are disabled or blind is not binding on us.

<u>See</u> 20 C.F.R. § 404.1504 (2015 version).  These were the rules (though not cited book and verse) applied by the ALJ as his justification for giving "very little weight" to the state agency physician (Dr. Erickson's) determination that Ms. Perrin was disabled for purposes of receiving MAWD benefits.

The court agrees that, pursuant to 20 C.F.R. § § 404.1527(d)(1) and 20 C.F.R. § 404.1504, the ALJ was not *bound* to accept the prior determination by the state agency doctor who determined Ms. Perrin was entitled to MAWD benefits (Dr. Erickson's opinion) that Ms. Perrin was disabled for purposes of receiving federal Social Security benefits.  Neither of those provisions, however, *prohibited* the ALJ from *considering* this evidence.  In fact, another part of the very same regulation provides that regardless of its source, the Commissioner *will* consider *every medical opinion received.*  <u>See</u> 20 C.F.R. § 404.1527(c).

More importantly, the ALJ's stated justification for disregarding Dr. Erickson's determination that Ms. Perrin was entitled to MAWD benefits

78

(that the criteria used for finding Ms. Perrin disabled under the MAWD program differ from criteria required by the Social Security Act—see AR 18) appears to be just plain wrong. Ms. Perrin supplied the explanation from the MAWD program which elaborates upon the requirements for entitlement to MAWD benefits (AR 506), one of which is that the individual must "meet the Social Security definition of being disabled, except for criteria related to employment." Id. The explanation goes on to explain that the applicant "must be employed." Id.

Dr. Erickson found Ms. Perrin was could <u>not</u> perform past relevant work, and was disabled per vocational rule 200.00. It is unclear on this record what "vocational rule 200.00" is, or what exactly the "criteria related to employment" means, but the ALJ should have at least offered an explanation for why he completely disregarded Dr. Erickson's opinion, while giving the other state agency physician's opinions "great weight" in light of the MAWD documentation which indicates the MAWD criteria for benefits is that the applicant "meet the Social Security definition of being disabled."

In brief, the Commissioner argues that the other two state agency physicians who opined Ms. Perrin was *not* disabled pursuant to the Social Security regulations were "expert opinions from a highly qualified source, and the ALJ must consider [them]." The ALJ found the two state agency physicians who opined Ms. Perrin was *not* disabled pursuant to Social Security regulations were entitled to deference, while he did not even consider the opinion of the state agency physician who, using the same Social Security

disability regulations, determined that Ms. Perrin *was* disabled.  The regulatory

cite for such the Commissioner's proposition is 20 C.F.R. § 404.1527 (f)(2).[12]

The ALJ did not discuss why he did not consider the opinion of the state

agency physician who, using the very same Social Security disability criteria,

opined Ms. Perrin *was* disabled, other than to incorrectly state that the criteria

used by that physician was not the same.  In the absence of such an

explanation, it is impossible to know whether the ALJ's decision to reject

Dr. McElroy's opinion because it was unsupported or inconsistent with other

evidence is supported by substantial evidence in the record.  Remand is

required for this reason as well.

### F.    Type of Remand

For the reasons discussed above, the Commissioner's denial of benefits is

not supported by substantial evidence in the record. Ms. Perrin requests

reversal of the Commissioner's decision with remand and instructions for an

---

[12] 20 C.F.R. § 404.1527(f)(2) states:  Administrative law judges are responsible for reviewing the evidence and making findings of fact and conclusions of law.  They will consider opinions of state agency medical or psychological consultants, other program physicians and psychologists, and medical experts as follows:

(i)Administrative law judges are not bound by any findings made by states agency medical or psychological consultants, or any other program physicians or psychologists.  State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of state agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion evidence, except for the ultimate determination about whether you are disabled.

award of benefits, or in the alternative reversal with remand and instructions to reconsider her case.

Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner of the Social Security Administration.  It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands.  A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling.  Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000).  A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings.  Id. Neither sentence six situation applies here.

A sentence four remand is applicable in this case.  Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding."  Buckner, 213 F.3d at 1011.  In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the

81

proper course is to remand for further administrative findings.  Id.; Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated.  See also Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability).  Therefore, a remand for further administrative proceedings is appropriate.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, this magistrate judge hereby respectfully RECOMMENDS that the Commissioner's decision should be REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Objections must be timely and specific in order to require de novo review by the

District Court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black,

781 F.2d 665 (8th Cir. 1986).

     DATED November 27, 2017.

                  BY THE COURT:

                  _____

                  VERONICA L. DUFFY
                  United States Magistrate Judge